UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------X
                                                            :
DYLAN G. JOHNSTON,
                                    Plaintiff,              :          10 Civ. 1681 (PAC) (DF)

            -against-                                       :          **REPORT AND**
                                                                       **RECOMMENDATION**
CARNEGIE CORPORATION OF NEW YORK,                           :
ELLEN BLOOM, VARTAN GREGORIAN, and
JEANNIE D'ONOFRIO,                                          :

                                    Defendants.             :
------------------------------------------------------------------------X

**TO THE HONORABLE PAUL A. CROTTY, U.S.D.J.:**

       In this employment discrimination action arising under the Americans with Disabilities

Act of 1990, 42 U.S.C. § 12112, *et seq.* ("ADA"), the New York State Human Rights Law, N.Y.

Exec. Law § 290, *et seq.* ("NYSHRL"), and the New York City Human Rights Law, N.Y. City

Admin. Code § 8-101, *et seq.* ("NYCHRL"), *pro se* plaintiff Dylan Johnston ("Plaintiff") alleges

that his former employer, defendant Carnegie Corporation of New York ("Carnegie"), as well as

certain members of its management, including its President, Vartan Gregorian ("Gregorian"); its

Chief of Staff and Operations, Jeannie D'Onofrio ("D'Onofrio"); and its Vice President of

Human Relations, Ellen Bloom ("Bloom") (collectively, the "Individual Defendants") (all,

collectively, "Defendants"), discriminated against him based on his alleged mental disability.

(*See generally* Complaint for Employment Discrimination, dated Feb. 3, 2010 ("Compl.")

(Dkt. 2).)  Currently before the Court is Defendants' motion to dismiss the Complaint on the

grounds that it is barred by a contractual release, or, in the alternative, that it fails to allege facts

sufficient to support Plaintiff's claims.  (Dkt. 6.)  For the reasons set forth below, I recommend

that Defendants' motion be granted in part and denied in part.

## FACTUAL BACKGROUND[1]

Plaintiff alleges that he was treated unfairly throughout his employment and was ultimately terminated because of his mental disability, which he describes as including depression and bipolar disorder.  (*See* EEOC Charge, at 1-2.)  Plaintiff claims in this action that Defendants failed to promote him or to compensate him adequately, and then terminated his employment in a discriminatory and retaliatory manner.  (*See id.*)  Defendants largely defend on the ground that, on January 15, 2009, Plaintiff signed an agreement by which he purportedly released Carnegie and its past or present agents from claims arising out of his employment.

### A.    Plaintiff's History

Plaintiff alleges that he was diagnosed with bipolar disorder was he was 17 years old and that he has struggled with mental illness throughout his life.  (*Id.* at 2.)  Despite these difficulties, Plaintiff earned a Bachelor's degree and received several accolades for his academic achievements while attending the College of Santa Fe.  (*Id.* at 1.)  Following his graduation from college, Plaintiff moved to New York City and was hired as a paid intern by Carnegie, a non-profit philanthropic foundation, in late November, 2006.  (*Id.* at 2.)

### B.    Alleged Denial of Promotion

Plaintiff alleges that he was denied any promotion during his tenure at Carnegie because of his disability.  (*See* Compl. at ¶ II(A); EEOC Charge at 7-11.)  His only specific allegation in this regard, however, is that he was denied a position for which he concedes that he withdrew his

---

[1] Except where otherwise stated, the facts set forth herein are taken from Plaintiff's Complaint and from the charge that Plaintiff apparently filed with the Equal Employment Opportunity Commission ("EEOC") prior to bringing this action.  As the EEOC charge (Charge of Discrimination, dated Oct. 2, 2008 ("EEOC Charge")) is annexed to Plaintiff's Complaint, it may be considered by the Court on motion to dismiss.  (*See* Discussion *infra* at § I(A).)

application.  (*See* EEOC Charge at 9-11.)  More particularly, he claims that he submitted his

resume for an "Investments Associate" position in January 2008, but then withdrew his

application in response to certain comments that were made to him regarding that position.  (*Id.*

at 10-11.)  Specifically, he alleges that D'Onofrio told him that he would not "want to work for

Ms. Leung," which struck Plaintiff as "odd" because Ms. Leung did not supervise the

Investments Associate position.  (*Id.* at 11.)  Based on this comment, as well as an e-mail

informing Plaintiff that Carnegie had "received a large volume of resumes" for the Investment

Associates position, Plaintiff "felt they wanted [him] out" and withdrew his application for the

position.  (*Id.* at 11.)

   Although Plaintiff does not allege that he actually applied for any other open positions at

Carnegie, he nevertheless claims that he was "consistently discouraged" from pursuing such

opportunities.  (*Id.* at 4-5, 8-10.)  For example, when an Executive Assistant position became

available in the Investments Office, defendant Bloom allegedly informed Plaintiff that the

supervisor for that position was "difficult" and that the previous assistant had quit after being

treated poorly.  (*Id.* at 9-10.)  Plaintiff alleges that he "began to feel like [he] was being

intentionally steered away from . . . the position."  (*Id.* at 10.)

   **C.**    **Increase in Hours Without Compensation**

   Plaintiff initially worked 20 hours per week in his position as an intern.  (*Id.* at 2.)

According to the Complaint, he performed "well" in the tasks he was given, and, in June 2007,

Defendants asked him to take on additional hours and responsibilities.  (*Id.* at 3, 8.)  Plaintiff

alleges that, starting in January 2008, his average work-week at Carnegie increased from 20

hours per week to 32, and he appears to allege that he worked an average of 32 hours per week

from January 2008 until November 2008.  (*See id.* at 3, 9.)

Plaintiff asserts, though, that he was not properly compensated for these additional hours. (*See id.* at 3, 10.) According to Plaintiff, Carnegie's employee handbook dictated that an employee who was "regularly scheduled to work" between 21 and 35 hours per week was to be "'paid a fixed salary and [be] eligible to participate in Carnegie Corporation's benefits program'" (Pl. Opp., Ex. 1 ("Employee Handbook"), p. III-2; EEOC Charge at 3), but Plaintiff was deprived of both a fixed salary and benefits, in contravention of this policy (EEOC Charge at 3-4). Plaintiff also claims that he did the same work as certain full-time employees, but he was paid less than they were. (*Id.* at 5, 11-12.)[2]

### D.  **Plaintiff's Reduction in Hours and Termination**

Although Plaintiff asserts that management initially asked him to increase his hours, he also contends that his hours were reduced after November 2008, and he appears to allege that this was because of his disability. (*See id.* at 17-18.)

According to Plaintiff, during a discussion with D'Onofrio in June 2008, in which they "compared medical histories," he told D'Onofrio about his struggle with bipolar disorder, his receipt of disability benefits, and his prior hospitalization. (*Id.* at 19; Pl. Opp. at 1-2.) Plaintiff alleges that, a few months later, on August 11, 2008, D'Onofrio told him that Carnegie's President (Gregorian) would no longer need his assistance after December, and she suggested that Plaintiff start looking for other work at that point. (*Id.* at 17.)[3] Then, in November 2008,

---

[2] Plaintiff claims that he was treated unfavorably in other respects as well. He alleges that he received only one performance review, in the first half of 2007, even though company policy was that "performance reviews [be] conducted for most staff members annually." (*Id.* at 23-24.) He also alleges that he was not given a permanent work area, and, as a result, he had to carry his work supplies in a basket to whatever office happened to be vacant that day. (*Id.*)

[3] In November 2008, Plaintiff was purportedly told that he could keep working at Carnegie until February, in light of the difficult job market. (*Id.*)

Plaintiff was allegedly required to reduce his hours back to 20 hours per week, and D'Onofrio reprimanded Plaintiff for working too many hours.  (EEOC Charge at 17-18.)  Plaintiff felt that he was being "abus[ed]," "humiliat[ed]" and "manipulat[ed]" because management had first asked him to work more than 20 hours and then criticized him for doing so.  (*See id.*)  The same month, defendant Bloom allegedly told Plaintiff that he would not be given a full-time job at Carnegie "because of benefits," and then offered him job-search advice.  (*Id.* at 17.)

Plaintiff alleges that, on January 8, 2009, he sent an e-mail to Bloom,[4] requesting a raise because his hourly compensation, $15 per hour, had remained unchanged throughout his two-and-a-half years at Carnegie.  (*Id.* at 4, 21.)  In this e-mail, Plaintiff also asked why his weekly work schedule had been reduced from 32 hours per week to 20, and whether such reduction was "an issue of benefits."  (*Id.* at 21.)  Bloom's e-mail response stated that Carnegie was not willing to increase Plaintiff's hourly wage, and encouraged Plaintiff to look for work elsewhere.  (*Id.* at 4, 22.)  In response, Plaintiff again asked Bloom why his hours had been reduced:

> You did not give a reason in your last email and the supporting reason you gave me last time[,] that "everyone is cutting back, I mean I didn't even get a bonus this year," does not fly with me.  I would appreciate a direct answer to the question.  If it is because you did a background check and found that I was disabled and think your healthcare co-pay will go up – very low indeed.  You can afford to pay [Carnegie employee] RZ maternity, health, and for 2 day work weeks!!! – and after only a few weeks of working at Carnegie.  If you reduced my hours because of educational benefits, the hours I was working do not warrant tuition reimbursement . . . .  Why, honestly, do you want me gone?

(*Id.* at 25.)  Plaintiff concluded this e-mail by asking Bloom to apologize for insinuating that Plaintiff lacked self-confidence.  (*Id.*)

---

[4] Plaintiff alleges that, according to Carnegie's personnel handbook, Bloom was the individual to whom violations of company policy were to be reported.  (*Id.* at 26.)

The next day, in a meeting with Bloom and D'Onofrio, Plaintiff's employment was terminated. (*Id.* at 25, 27.) Plaintiff claims that he was fired in retaliation for having sent an "email opposing what [he] felt to be a practice [that] was unlawful discrimination." (*Id.* at 26; *see also id.* at 5.) Plaintiff also asserts that Defendants were aware of his disability because of various statements he had made during the course of his employment. (*See id.* at 19-21.) Aside from his alleged conversation with D'Onofrio in June 2008, as described above, Plaintiff alleges that he sent D'Onofrio an e-mail message on June 13, 2007, in which he stated that he "was the designated nutcase [who] went to therapy for [his] whole crazy family." (*Id.* at 20.) Plaintiff also alleges that he told Gregorian and others that, at some point, he had been taking an unspecified medication that had caused him to gain weight (*id.*), and that he once "joked" that he was able to tolerate a difficult co-worker because "[the] mood stabilizers [he] was on took the edge off" (*id.* at 21; *see also id.* at 20 (generally alleging that "some people were aware [that he] was on medication and a few of those were aware of [his] history of mental illness")).[5]

### E.    Plaintiff's Release of Claims

At the January 9, 2009 meeting in which his employment was terminated, Carnegie offered Plaintiff a severance package in exchange for a release of his rights to bring any claims against Carnegie relating to his employment. (*Id.* at 29.) This severance package, including the release, was memorialized in a letter agreement, dated January 12, 2009, addressed to Plaintiff. (*See* Gilbride Decl., Ex. B ("Agreement").[6])

---

[5] Plaintiff also alleges that, over time, defendant Gregorian made "harass[ing]" comments to him, including comments that may have been directed to Plaintiff's actual or perceived disability, such as asking, "What the hell is wrong with you?" (*See id.* at 16.)

[6] Plaintiff repeatedly refers to this letter agreement throughout his Complaint. (*See, e.g.*, EEOC Charge at 4, 5, 26, 27, 28 (summarizing certain terms of the release, and describing letter

The second paragraph of this letter agreement stated, in relevant part:

> On January 9th, 2009 you were officially given notice that your assignment would end as of March 13, 2009.  We have agreed to give you non-working notice, effective January 12, 2009 through March 13, 2009.  For your benefit, we will use 30 to calculate your weekly hours at your current rate of 15 dollars pre-tax for these 9 weeks.  Upon signing the Release you will be eligible for a lump sum amount of $4,050 (less necessary/applicable deductions).

(*Id.*)  The letter then informed Plaintiff that, under the terms of the release, he would waive all claims against Carnegie with respect to his employment.  (*Id.*)  The letter stated, "This is a legally binding document," and it cautioned Plaintiff, in capital letters:  "DO NOT SIGN THIS RELEASE UNLESS YOU THOROUGHLY UNDERSTAND IT."  (*Id.*)

The letter then set forth a section entitled "Release" (*id.*), which provided, among other things, that, "[i]n exchange for the severance pay of $4,050 (subject to employment taxes) offered to [Plaintiff] by Carnegie Corporation," Plaintiff would agree to

> release [Carnegie] and all its past and/or present trustees, employees, [and] agents [the "Corporation Officials"]. . . from any and all causes of action . . . which Plaintiff or [his successors] ever had, now have or may have against the Corporation Officials, whether known or unknown to [Plaintiff], by reason of [Plaintiff's] employment and/or cessation of employment with [Carnegie], or otherwise involving facts which occurred on or prior to the date that [Plaintiff has] signed this Release, other than a Claim that [Carnegie] has failed to pay [Plaintiff] severance in the amount of $4,050 as agreed.  Such released claims include, without limitation, any and all claims under . . . the Americans with Disabilities Act, . . . and any and all other federal, state or local

---

agreement as "a document full of complex groundless legal stipulations").)   Accordingly, the agreement is incorporated by reference in the Complaint and may be considered by the Court on this motion to dismiss.  *See, e.g.*, *Clifford v. HBO, Inc.*, No. CV-08-3357 (SJF)(AKT), 2009 U.S. Dist. LEXIS 43352, at *7-8 (E.D.N.Y. May 18, 2009) (finding that release agreement was incorporated by reference because plaintiff had, in his complaint, "specifically refer[red] to the 'severance package' he accepted upon his termination"); *see also* Discussion *infra* at § I(A).

> laws, statutes, rules and regulations pertaining to employment, as
> well as any and all Claims under state contract or tort law.

(*Id.* at 1-2.)

Under the terms of the agreement, Plaintiff was given 21 days to review the agreement before signing it, as well as a seven-day revocation period following execution. (*Id.* at 2.) On January 15, 2009, Plaintiff signed the agreement and submitted it to Carnegie. (*See id.*)

Plaintiff claims that the release is unenforceable because he did not understand what he was signing, and because the agreement was executed as a result of duress, undue influence, and misrepresentations made by Defendants. (EEOC Charge at 1, 4, 5; Compl. at ¶ II(E)(4), Pl. Opp. at 2.) More specifically, Plaintiff alleges that he "was led to believe that Carnegie's substantiation of [his] claim [for] unemployment benefits (as well as COBRA coverage . . .) was contingent upon [his] signing of the non-disclosure[7] [*i.e.*, release] form." (EEOC Charge at 5; *see also id.* at 29; Compl. at ¶ II(E)(4) (alleging that Defendants told Plaintiff that their "substantiation of [his] claim [for] unemployment benefits would be contingent upon [his] signing" the release).)

### F.   Plaintiff's Efforts To Secure Recommendations from Defendants

Following his termination, Plaintiff allegedly continue to work for Gregorian (Carnegie's President), without pay, until February 27, 2009. (*See* EEOC Charge at 5.) Plaintiff claims that he was promised positive recommendations and referrals in exchange for this unpaid work, but he appears to allege that Defendants' actions in this regard were inadequate. (*Id.* at 6.)[8] Plaintiff

---

[7] Throughout his EEOC Charge, Plaintiff refers to the release agreement as a "non-disclosure form" or a "non-disclosure contract." (*See, e.g.*, EEOC Charge at 5, 27, 28.)

[8] Plaintiff alleges that he "was told he would get [recommendations] at other foundations, and after being told this I honestly thought [Carnegie's president] would help me get an

also alleges that, after he filed a complaint about Defendants with the Equal Employment

Opportunity Commission ("EEOC"), a Carnegie employee was instructed not to give Plaintiff a

recommendation letter, in retaliation for Plaintiff's filing of that complaint.  (Compl., § II(E)(7)

(alleging that Carnegie employee was instructed "not to follow through with an agreement to

give [Plaintiff] a recommendation" after Plaintiff filed his EEOC charge against Defendants).)

## PROCEDURAL HISTORY

### A.    Plaintiff's EEOC Charge

Plaintiff filed his EEOC charge against Defendants on October 2, 2009.  (*See* Compl.,

§ III(A); EEOC Charge at 1.)  On November 10, 2009, the EEOC concluded that, based upon its

investigation, it was "unable to conclude that the information obtained establishe[d] a violation

of the [law]."  (Dismissal and Notice of Rights, dated Nov. 10, 2009 (attached to Complaint).)

Plaintiff was issued a "right to sue" letter at that time.  (*See id.*)

### B.    Plaintiff's Lawsuit and the Pending Motion

Proceeding *pro se,* Plaintiff commenced this action on February 3, 2010.  (*See* Complaint

for Employment Discrimination, dated Feb. 3, 2010 (Dkt. 2).)

On June 22, 2010, Defendants' filed a motion to dismiss the Complaint.  (*See* Notice of

Motion, dated June 22, 2010 (Dkt. 6); Memorandum of Law in Support of Defendants' Motion

to Dismiss Pursuant to 12(b)(6), dated June 22, 2010 ("Def. Mem.") (Dkt. 7); Declaration of

Joan M. Gilbride, Esq., dated June 22, 2010 ("Gilbride Decl.") (Dkt. 8).)  On July 27, 2010,

---

interview or two, maybe, if I stuck around."  (*Id.* at 35.)  Although Plaintiff states that "nothing
came of [Defendants'] offers [of] assistance," he does admit that Carnegie sent out some
recommendation letters on his behalf.  (*Id.*)  These letters, however, were neither as thorough nor
as timely as Plaintiff wished.  (*See id.* (describing six-sentence reference letter, as well as a "grad
school recommendation" letter that Defendants sent only two days before the deadline).)

Plaintiff filed an affidavit and memorandum in opposition to Defendants' motion.  (*See* Pro Se

Response to Motion to Dismiss, dated July 24, 2010 ("Pl. Opp.") (Dkt. 13).)  On August 9, 2010,

Defendants filed a one-page "Reply Declaration" enclosing a copy of an endorsed severance

check, but filed no reply memorandum.  (*See* Dkt. 14.)  Plaintiff then submitted three brief sur-

replies (*see* Dkts. 15, 16, 18), to which Defendants objected on procedural grounds (*see, e.g.*,

Letter to the Court from Julie A. Rivera, Esq., dated Sept. 23, 2010 (Dkt. 21)).

## DISCUSSION

### I.   APPLICABLE LEGAL STANDARDS

#### A.   Rule 12(b)(6)

A case is subject to dismissal under Rule 12(b)(6) of the Federal Rules of Civil Procedure

where the complaint is not legally sufficient to state a claim upon which relief can be granted.

*See Kopec v. Coughlin*, 922 F.2d 152, 155 (2d Cir. 1991).  In deciding a Rule 12(b)(6) motion,

the Court "accept[s] as true all factual statements alleged in the complaint and draw[s] all

reasonable inferences in favor of the non-moving party."  *McCarthy v. Dun & Bradstreet Corp.*,

482 F.3d 184, 191 (2d Cir. 2007) (citation omitted); *accord Jaghory v. New York State Dep't of

Ed.*, 131 F.3d 326, 329 (2d Cir. 1997).  Further, "[i]t is well established that the submissions of a

*pro se* litigant must be construed liberally and interpreted 'to raise the strongest arguments that

they suggest.'"  *Triestman v. Fed. Bureau of Prisons*, 470 F.3d 471, 474 (2d Cir. 2006)

(collecting authority); *see also Hughes v. Rowe*, 449 U.S. 5, 10 (1980) (a *pro se* party's

pleadings must be liberally construed in his favor and are held to a less stringent standard than

the pleadings drafted by lawyers).

An employment discrimination plaintiff need not necessarily plead a *prima facie* case of

discrimination, *see Swierkiewicz v. Sorema, N.A.*, 534 U.S. 506, 515 (2002) (noting that "the

Federal Rules do not contain a heightened pleading standard for employment discrimination suits"), as long as he "satisf[ies] Rule 8(a)'s standard of a 'short and plain statement of the claim showing that [he] is entitled to relief,'" *Boykin v. Keycorp*, 521 F.3d 202, 213 (2d Cir. 2008) (citing Fed. R. Civ. P. 8(a)(2)). This means that the complaint need only "give respondent fair notice of what petitioner's claims are and the grounds upon which they rest." *Swierkiewicz*, 534 U.S. at 514 (complaint that detailed events leading up to Plaintiff's termination with relevant dates and nationalities "easily satisfied the requirements of Rule 8(a)" as to claim of discrimination based on national origin). At the same time, "conclusory allegations or legal conclusions masquerading as factual conclusions will not suffice to defeat a motion to dismiss." *Achtman v. Kirby, McInerney & Squire*, LLP, 464 F.3d 328, 337 (2d Cir. 2006) (citation omitted). In addition, even plaintiffs who are proceeding *pro se* must comply with any relevant procedural and substantive rules, and, to survive a motion to dismiss, a *pro se* complaint must "'state[] a plausible claim for relief.'" *Harris v. Mills*, 572 F.3d 66, 72 (2d Cir. 2009) (quoting *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1950 (2009)); *see generally Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007); *Barbosa v. Continuum Health Partners, Inc.*, 716 F. Supp. 2d 210, 215 (S.D.N.Y. 2010) ("Reconciling *Swierkiewicz*, *Twombly*, and *Iqbal*, a complaint need not establish a *prima facie* case of employment discrimination to survive a motion to dismiss; however, 'the claim must be facially plausible and must give fair notice to the defendants of the basis for the claim.'" (quoting *Fowler v. Scores Holding Co.*, 677 F. Supp. 2d 673 (S.D.N.Y. 2009))).

On a motion to dismiss a complaint, the Court limits its considerations to: (1) the factual allegations in the complaint; (2) documents attached to the complaint as exhibits or incorporated in it by reference; (3) matters of which judicial notice may be taken; and (4) documents that are

11

"integral" to the complaint.  *Calcutti v. SBU, Inc.*, 273 F. Supp. 2d 488, 498 (S.D.N.Y. 2003)

(citing *Brass v. American Films Technologies*, 987 F.2d 142, 150 (2d Cir. 1993); *Chambers v.*

*Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002)).  In addition, the mandate that a *pro se*

plaintiff's complaint be construed liberally makes it appropriate for the court to consider the

factual allegations in the plaintiff's opposition materials to supplement the allegations in the

complaint.  *See Johnson v. Wright*, 234 F. Supp. 2d 352, 356 (S.D.N.Y. 2002); *Burgess v.*

*Goord*, No. 98 Civ. 2077 (SAS), 1999 U.S. Dist. LEXIS 611, at *2 n.1 (S.D.N.Y. Jan 26, 1999).

### B.    Validity of Release

A release of federal discrimination claims is valid only if, "considering the 'totality of

circumstances,' the individual's waiver of his or her right can be characterized as 'knowing and

voluntary.'"  *Laramee v. Jewish Guild for the Blind*, 72 F. Supp. 2d 357, 359 (S.D.N.Y. 1999)

(citation omitted).  In examining the "totality of circumstances," the Court should consider the

following factors:  "1) the plaintiff's education and business experience, 2) the amount of time

the plaintiff had possession of or access to the agreement before signing it, 3) the role of plaintiff

in deciding the terms of the agreement, 4) the clarity of the agreement, 5) whether the plaintiff

was represented by or consulted with an attorney, and 6) whether the consideration given in

exchange for the waiver exceeds employee benefits to which the employee was already entitled

by contract or law."  *Bormann v. AT&T Communications, Inc.*, 875 F.2d 399, 403 (2d Cir. 1989)

(internal quotation marks and citation omitted).  The Court should also consider "whether an

employer encourages or discourages an employee to consult an attorney . . . , and whether the

employee had a fair opportunity to do so."  *Id.* (citation omitted).  "These factors are neither

exhaustive nor must all of the factors be satisfied before a release is enforceable."  *Laramee*, 72

F. Supp. 2d at 360 (citing *Nicholas v. NYNEX, Inc.*, 929 F. Supp. 727, 730 (S.D.N.Y. 1996)); *see*

*generally Livingston v. Adirondack Bev. Co.*, 141 F.3d 434, 437-38 (2d Cir. 1998) (the validity

of a release of federal discrimination claims is "a peculiarly fact-sensitive inquiry").

        Under New York law, "a release that is clear and unambiguous on its face and which is

knowingly and voluntarily entered into will be enforced," *Pampillonia v. RJR Nabisco. Inc.*, 138

F.3d 459, 463 (2d Cir. 1998) (citing *Skluth v. United Merchants & Mfrs., Inc.*, 559 N.Y.S.2d

280, 282 (1st Dep't 1990)), and such a release may bar employment discrimination claims

arising under New York state and local anti-discrimination laws, *see, e.g.*, *Gant v. Brooklyn Dev.

Ctr.*, 762 N.Y.S.2d 507 (2d Dep't 2003); *Skluth*, 559 N.Y.S.2d 280.  Although the state test to

determine when a release is enforceable has been described as less "stringent" than the analysis

required for waivers of federal discrimination claims, *see Nicholas*, 929 F. Supp. at 730;

*Cordoba v. Beau Deitl & Assocs.*, 02 Civ. 4951 (MBM), 2003 U.S. Dist. LEXIS 22033, at *20

(S.D.N.Y. Dec. 8, 2003), New York courts have nevertheless recognized that the six *Bormann*

factors, listed above, are "just as relevant to a determination of the validity of a waiver of [state

law] claims."  *Skluth*, 559 N.Y.S.2d at 284 (citing *Equal Employment Opportunity Commn. v.

American Express Publ. Corp.*, 681 F. Supp. 216 (S.D.N.Y. 1988)).

II.     **DEFENDANTS' MOTION TO DISMISS**[9]

A.     **Validity of the Release**

For the reasons set forth below, Defendants' motion to dismiss should be denied insofar as it seeks dismissal based upon an enforceable waiver agreement.

1.     **Validity of the Release with Respect to Plaintiff's Federal Claims**

An analysis of the *Bormann* factors indicates that it would be premature to conclude, at this stage in the litigation, that Plaintiff's waiver can be characterized as "knowing and voluntary."

The first *Bormann* factor, Plaintiff's education and business experience, does not particularly favor either a finding of validity or invalidity.  On the one hand, Plaintiff graduated from college and was employed by Carnegie for more than two years prior to his termination.  (*See* Pl. Opp. at 3.)  On the other hand, Plaintiff appears to allege that he had little work experience prior to his employment with Carnegie, and it is plain that he was hired there as a low-level employee.  (*See id.*)  Further, Plaintiff contends that his college degree in Art History was "irrelevant" to his ability to understand the release agreement and that he "had no idea what was going on" during his termination.  (*Id.*)  Especially in light of the confusing nature of certain aspects of the parties' release agreement (*see infra*), it is not clear that Plaintiff's education and experience gave him sufficient sophistication to understand all of the agreement's terms.  *Cf.*

---

[9] Although Defendants served a Local Civil Rule 12.1 Statement, informing Plaintiff of the possibility that the Court might convert their motion to one for summary judgment, Defendants have neither asked the Court to grant summary judgment nor have they submitted a statement of undisputed facts, as required by Local Civil Rule 56.1.  In such circumstances, and particularly in light of Plaintiff's *pro se* status, conversion to summary judgment would be inappropriate.  *See, e.g.*, *Baptiste v. Warden at Ottisville, FCI N.Y.*, No. 09 Civ. 5523 (AKH), 2010 U.S. Dist. LEXIS 81291, at *9 (S.D.N.Y. Aug. 11, 2010) (citing *Perez v. Hawk*, 302 F. Supp. 2d 9, 16 (E.D.N.Y. 2004)).

*Laramee*, 72 F. Supp. 2d at 360 (plaintiff's 16 years of secretarial experience and her high school diploma "neither favors nor disfavors" a finding that the release was valid).

The second factor, the amount of time that Plaintiff had to consider the agreement before signing it, supports a finding of validity.  The release agreement specifically gave Plaintiff 21 days to review its terms before signing it (*see* Agreement at 2), which is adequate time for Plaintiff to have reviewed its terms, *see Dewey v. PTT Telecom Netherlands, US, Inc.*, 94 Civ. 5983 (HB), 1995 U.S. Dist. LEXIS 13134, at * 6 (S.D.N.Y. Sept. 12, 1995) (finding four days for review sufficient); *Evans v. Waldorf-Astoria Corp.*, 827 F. Supp. 911, 913 (E.D.N.Y. 1993) (holding release valid even though "plaintiff only had access to the agreement for a few hours"), *aff'd*, 33 F.3d 49 (2d Cir. July 5, 1994) (table).

The third factor, however – Plaintiff's role in negotiating terms of the release – slightly favors a finding of invalidity.  Plaintiff does not allege that he attempted to negotiate the terms of the agreement, but rather maintains that any such effort would have been futile:  "I had no leverage, nothing to bargain with, no influence in crafting a mutually acceptable resolution – there was nothing for me to negotiate with and they had no interest or need to negotiate with someone at my level."  (Pl. Opp. at 4.)  Although Courts have held that a plaintiff's failure to negotiate the terms of a release, by itself, does not render the release involuntary, s*ee, e.g.*, *Bormann*, 875 F.2d at 403 n.1, the other *Bormann* factors discussed below compel the conclusion that, at this stage of the litigation, the release cannot be deemed knowing and voluntary.

The fourth factor, the clarity of the agreement, also weighs in favor of a finding of invalidity, at least at this point.  Plaintiff argues that the release agreement was unclear with respect to his rights concerning future compensation and severance, as well as unemployment

benefits.  (*See* Pl. Opp. at 3.)  The agreement's lack of clarity regarding severance and pay was,

according to Plaintiff, particularly exacerbated by its use of the term "non-working notice," for

which Plaintiff has not found a comprehensible definition.  (*See id.*)  Plaintiff's argument is

bolstered by the fact that Defendant's attorney's interpretation of the agreement – as set forth in

Defendants' motion papers – is inconsistent with how Plaintiff claims Defendants actually

performed the agreement.  In their motion, Defendants maintain that the release agreement

entitled Plaintiff to *both* (1) the continued payment of Plaintiff's "regular pay check" from

January 12 until March 13, 2009, without any obligation for Plaintiff to appear for work (*i.e.*,

"non-working notice"), *and* (2) a lump-sum severance payment of $4050.  (Def. Mem. at 4.[10])  In

his opposition to Defendants' motion, however, Plaintiff states that he was paid only the $4050

lump sum, and did not receive additional pay from January 12 to March 13, 2009.  (Pl. Opp. at 5

("I did not receive regular pay in addition to severance.  I received the severance, which was the

total of what regular pay would [have been] up until a fictitious termination date in March,

2010.").)  From the language of the agreement (which explains that Plaintiff's severance

payment of $4050 would be calculated based on the hours he would have been expected to work

between the date of the agreement and the date that his "assignment would end" (*see* Factual

Background, § E, *supra*)), it is, in fact, difficult to conclude that Defendants' current explanation

of the agreement makes sense.  At a minimum, given how Defendants allegedly paid Plaintiff,

they are hard-pressed to argue that the agreement unambiguously supports their current

interpretation of it.  *See generally Krumme*, 238 F.3d at 138-39 (agreement is ambiguous if it is

---

[10] Defendants' brief states:  "In addition to the severance package, [Plaintiff] continued to receive his regular pay check until March 13, 2009 and was under no obligation to appear for work."  (Def. Mem. at 4.)

"capable of more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement").

The parties' submissions provide no information with respect to the fifth *Bormann* factor, whether Plaintiff consulted an attorney prior to signing the release agreement.  Even if Plaintiff did not consult an attorney, however, this factor weighs only somewhat in favor of a finding of invalidity, as the release agreement instructed Plaintiff to consult a lawyer and gave him adequate time to do so.  *See Bormann*, 875 F.2d at 403 (in determining whether waiver was knowing and voluntary, the district court should consider "whether an employer encourages or discourages an employee to consult an attorney, . . . and whether the employee had a fair opportunity to do so").

The sixth factor is "whether the consideration given in exchange for the waiver exceeds employee benefits to which the employee was already entitled by contract or law."  *Bormann*, 875 F.2d at 403.  The pertinent inquiry is whether "the severance benefits [provided to plaintiff] truly were greater than the [plaintiff] would have been entitled to absent [his] execution of the [release] agreement."  *Emples. Committed For Justice v. Eastman Kodak Co.*, 407 F. Supp. 2d 423, 436 (W.D.N.Y. 2005).  As a threshold matter, Plaintiff appears to allege that he was owed back-pay at the time of his termination because he "was never paid salary for what [he] should have been paid for [his] part-time salaried employment while [he] was working [more than 21 hours per week], nor was [he] compensated for back-benefits due because his part-time salaried employment."  (Pl. Opp. at 5.)  Furthermore, as explained above, the parties appear to dispute the amount of consideration to which Plaintiff was entitled under the release agreement.  This factor therefore supports a finding of invalidity at this stage in the litigation.

17

Finally, although not listed as one of the *Bormann* factors, the Court notes that Plaintiff

has raised the suggestion that he signed the agreement under duress, based on a threat that

Defendants would block him from receiving either unemployment or COBRA benefits unless he

executed the release.  (*See* Factual Background, § E, *supra*.)  The fact that Defendants may have

pressured him to execute the release, while not determinative of validity,[11] tends to support

Plaintiff's argument that the release should be held unenforceable.

Considering the totality of the circumstances, the Court cannot conclude, at this juncture,

that Plaintiff's waiver can be characterized as "knowing and voluntary."  *Bormann*, 875 F.2d at

403.  Most importantly, this Court has repeatedly held that a release agreement cannot serve to

bar federal discrimination claims where, as here, there is a legitimate dispute about the amount

of consideration due under that agreement.  *See, e.g.*, *Grant-Hyndman v. Olivetti Mgmt. of Am.*,

95 Civ. 7736 (CSH), 1997 U.S. Dist. LEXIS 15690 (S.D.N.Y. Oct. 9, 1997) (denying summary

judgment based on a waiver agreement where "it [was] not evident that defendant in any way

made clear the terms of the bargain to which plaintiff was asked to agree," even though there

was no dispute that the plaintiff had received *some* payment); *Depalma v. Realty IQ Corp.*, 01

Civ. 446 (RMB), 2002 U.S. Dist. LEXIS 4911 (S.D.N.Y. Mar. 25, 2002) (concluding that release

could not be deemed "knowing and voluntary" for the purposes of the defendants' Rule 12

motion because there was a dispute as to whether two-weeks salary – *i.e.*, the amount paid to the

plaintiffs in exchange for the release – exceeded the pay to which the plaintiffs were entitled, in

any event, absent the release); *EEOC v. American Express Pub. Corp.*, 681 F. Supp. 216, 220

---

[11] *See, e.g.*, *Malaney v. El Al Isr. Airlines*, No. 07 Civ. 8773 (DLC), 2008 U.S. Dist.
LEXIS 1709, at *6-7, 11-16 (S.D.N.Y. Jan. 4, 2008) (finding release valid even though plaintiff
had been told that "in order to be eligible for severance and medical benefits, she was required to
sign a release"), *aff'd*, 331 Fed. Appx. 772 (2d Cir. May 28, 2009).

(S.D.N.Y. 1998) (denying motion for summary judgment based upon release agreement where, *inter alia*, the amount of consideration was in dispute).  Defendants' motion to dismiss Plaintiff's federal claims based on the release agreement should therefore be denied.

2.        **Validity of the Release with Respect to Plaintiff's State Law Claims**

For essentially the same reasons, the Court should decline to enforce the release agreement, at this stage, to bar Plaintiff's state law claims.  As set forth above, only "a release that is clear and unambiguous on its face and which is knowingly and voluntarily entered into will be enforced" under New York law.  *Pampillonia v. RJR Nabisco. Inc.*, 138 F.3d at 463 (citing *Skluth*, 559 N.Y.S.2d at 282).  The above analysis of the *Bormann* factors indicates that it would be premature to conclude, in this case, that Plaintiff "knowingly and voluntarily entered into" the release agreement.  Defendants' motion to dismiss Plaintiff's state law claims based upon an enforceable release should therefore be denied.

B.        **Adequacy of Plaintiff's Pleading**

Defendants argue that, even if the release is not enforceable, Plaintiff nevertheless fails to state any claim upon which relief may be granted.  In this regard, Defendants argue that: (1) Plaintiff has inadequately pleaded Defendants' knowledge of his alleged disability (Def. Mem. at 10-11); (2) Plaintiff has failed to state a failure-to-promote claim (*id.* at 12-13); (3) the Individual Defendants cannot be held liable under the ADA (*id.* at 13); (4) Plaintiff has failed to state a claim for retaliation based upon his termination, as he has not alleged that he engaged in any "protected activity" prior to his termination (*id.* at 14-15); and (5) Plaintiff's state law discrimination claims against the Individual Defendants must be dismissed because he has not adequately alleged that the Individual Defendants were his "employers" or that they were actually involved in Carnegie's alleged misconduct (*id.* at 15-17).

19

The Court will address each of these arguments in turn.

### 1.  Defendants' Alleged Knowledge of Plaintiff's Disability

Defendants contend that Plaintiff has failed to state a claim for discrimination because he has not adequately alleged that Defendants were aware of his disability.  (Def. Mem. at 10-11.) Plaintiff's allegations in this regard are, however, sufficient to state a plausible discrimination claim.

The ADA prohibits covered employers from discriminating against "a qualified individual with a disability because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a).  Under the ADA, the definition of "disability" covers an individual who is "regarded as having such an impairment" by his employer, whether or not the individual actually suffers from a disability.  *See* 42 U.S.C. §12012(2)(C); *see also Capobianco v. City of New York*, 422 F.3d 47, 56 (2d Cir. 2005).

In this case, Plaintiff pleads that he not only explicitly raised the fact of his disability in the e-mail he sent to Bloom just before his termination (*see* EEOC Charge at 25), but also that he told D'Onofrio in June 2008 about his medical history, including his "struggle with mental illness," his bipolar disorder, and his prior hospitalization (*see id.* at 19; Pl. Opp. at 1-2).  This allegation regarding Plaintiff's conversation with D'Onofrio plausibly establishes that Defendants were aware of Plaintiff's alleged disability from at least June 2008 onward, and much of the conduct about which Plaintiff complains (including the reduction in his hours, which led up to his termination) occurred after that date.  Further, affording Plaintiff's allegations a liberal construction, he has also adequately pleaded that additional comments he

20

made to Gregorian, D'Onofrio and others during the course of his employment (including a 2007 e-mail to D'Onofrio, in which Plaintiff purportedly characterized himself as a "nutcase" who had gone to" therapy") would have given Defendants earlier notice that he had received treatment for some form of mental illness.  (*See generally* EEOC Charge at 19–21.)  Even if certain of Plaintiff's purported comments were not sufficiently specific to place Defendants on notice that he had a particular, diagnosed mental illness (such as depression or bipolar disorder), the totality of Plaintiff's allegations are nonetheless sufficient to plead that Defendants were aware, or would have had reason to believe, that Plaintiff had some type of mental health disability.

**2.     Plaintiff's Failure-To-Promote Claim**

Defendants contend that Plaintiff's failure-to-promote claim must be dismissed because he has not alleged that he applied for a position and was rejected for that position.  (Def. Mem. at 12.)  In general, to state a claim for failure to promote, a plaintiff "must 'allege that she or he applied for a specific position or positions and was rejected therefrom, rather than merely asserting that on several occasions she or he generally requested promotion.'"  *Billups v. Dent Wizard Int'l Corp.*, No. 05 Civ. 9356 (DAB), 2010 U.S. Dist. LEXIS 60255, at *21-22 (S.D.N.Y. June 14, 2010) (quoting *Brown v. Coach Stores, Inc.*, 163 F.3d 706, 710 (2d Cir. 1998)); *Salerno v. Town of Bedford*, No. 05 Civ. 7293 (SCR), 2008 U.S. Dist. LEXIS 99373, at *25 (S.D.N.Y. Dec. 3, 2008) ("[a]ctual claims of failure to promote require allegations that an employee 'applied for a specific position or positions and was rejected therefrom, rather than merely asserting that on several occasions she or he generally requested promotion'" (citation omitted)); *Smith v. St. Luke's Roosevelt Hosp.,* No. 08 Civ. 4710 (GBD) (AJP), 2009 U.S. Dist. LEXIS 69995, at *65-69 (S.D.N.Y. Aug. 11, 2009), *adopted by* 2009 U.S. Dist. LEXIS 81320 (S.D.N.Y., Sept. 2, 2009); *see also Deshpande v. TJH Med. Servs., P.C.*, 861 N.Y.S.2d 697 (2d

Dep't 2008) (noting that the standard for failure-to-promote claims under the NYSHRL and NYCHRL is the same as the standard governing federal claims, and dismissing plaintiff's NYSHRL and NYCHRL failure-to-promote claims because plaintiff "did not allege any specific instance where the [defendants] refused to promote him to a position for which he applied and for which he was qualified").

  Here, Plaintiff has not alleged that he actually applied for a particular job position and was rejected.  He alleges that he applied to one position at Carnegie, and that he subsequently withdrew that application voluntarily.  Even if Defendants discouraged Plaintiff from applying for other positions, or encouraged Plaintiff to withdraw his sole application, such discouragement would not give rise to a claim for failure to promote.  *See Brown*, 163 F.3d at 709, 717 (dismissing failure-to-promote claim based on plaintiff's failure to apply for open positions, even though plaintiff had been "discouraged from applying for" those positions).[12]

  Thus, Plaintiff has failed to state a claim for failure to promote under federal, state, or city law, and this claim is subject to dismissal.  Nonetheless, the Court should not dismiss the

---

  [12] Nor is there any hint in this case that Defendants engaged in a "pattern or practice" of discrimination that would have rendered "futile" any application by Plaintiff for promotion.  *See Brown,* 163 F.3d at 711 (citing *International Brotherhood of Teamsters v. United States*, 431 U.S. 324, 367-68 (1977)).  Even if such a "pattern or practice" claim could be viable in the context of an individual suit, as opposed to a class action – an argument the Second Circuit has not directly addressed, *see id..,* but that most circuit courts have rejected, *see, e.g., Schuler v. PricewaterhouseCoopers, LLP*, No. 05-2355 (RJL), 2010 U.S. Dist. LEXIS 100953, at *14 n.2 (D.D.C. Sept. 22, 2010) (citing cases)) – no such a claim could proceed here, given the complete absence of any suggestion that other employees, besides Plaintiff, were subjected to discriminatory conduct by Defendants.  In this regard, it should be noted that neither Plaintiff's general allegations that Defendants had a history of "breaches of good faith and fair dealing" with its employees (EEOC Charge at 36), nor Plaintiff's assertion that President Gregorian "'was such a bastard that 49% of the employees left'" (*id.* at 37 (quoting e-mail from Carnegie employee)), suggest that Defendants discriminated against other employees based on their membership in any protected class.

claim of a *pro se* plaintiff "without granting leave to amend at least once[,] when a liberal reading of the complaint gives any indication that a valid claim might be stated." *Cuoco v. Moritsugu*, 222 F.3d 99, 112 (2d Cir. 2000) (internal citations and quotation marks omitted).  In light of Plaintiff's *pro se* status, he should be afforded the opportunity to plead additional allegations demonstrating that he actually applied for and was rejected from a job position.

### 3.   Individual Capacity Claims Under the ADA

Defendants properly maintain that individuals cannot be held liable in their individual capacities under the ADA.  (*See* Def. Mem. at 13; *Spiegel v. Schulmann*, 604 F.3d 72, 79-80 (2d Cir. 2010); *Harris v. Mills*, 572 F.3d 66, 72 (2d Cir. 2009).)  Thus, to the extent that the Complaint may be read to assert ADA claims against the Individual Defendants in their individual capacities, such claims should be dismissed.

### 4.   Plaintiff's Retaliation Claims

To establish retaliation under the ADA, the NYSHRL, or the NYCHRL, a plaintiff must show (1) that he participated in a protected activity, (2) that his employer was aware of the protected activity, (3) that his employer took adverse employment action against him, and (4) that there was a causal connection between the protected activity and the adverse employment action.  *Hanig v. Yorktown Cent. Sch. Dist.*, 384 F. Supp. 2d 710 (S.D.N.Y. 2005) (apply federal law) (citing *Treglia v. Town of Manlius*, 313 F.3d 713, 719 (2d Cir. 2002)); *Forrest v. Jewish Guild for the Blind*, 3 N.Y.3d 295, 312-13 (2004) (applying state and city law). "The term 'protected activity' refers to action taken to protest or oppose statutorily prohibited discrimination," *Cruz v. Coach Stores, Inc.*, 202 F.3d 560, 566 (2d Cir. 2000) (citing 42 U.S.C. § 2000e-3), and may take the form of either formal or informal complaints, *Conway v. Microsoft Corp.*, 414 F. Supp. 2d 450, 466 (S.D.N.Y. 2006).  To constitute protected activity, the plaintiff's

23

conduct "'must [have] put the employer on notice that the [plaintiff] believe[d] that discrimination [was] occurring.'" *Id.* (citing *Ramos v. City of New York*, No. 96 Civ. 3787 (DLC), 1997 U.S. Dist. LEXIS 10538, at *7 (S.D.N.Y. July 22, 1997)).

Plaintiff alleges that he was terminated in retaliation for sending an e-mail which, according to Plaintiff, contained a complaint about purportedly unlawful discrimination. (EEOC Charge at 26.) In that e-mail, Plaintiff allegedly asked for an explanation as to why his hours had been reduced, and then stated, "[i]f it is because you did a background check and found that I was disabled and think your healthcare co-pay will go up – very low indeed." (*Id.* at 25.) In the same e-mail, Plaintiff allegedly stated, "If you reduced my hours because of educational benefits, the hours I was working do not warrant tuition reimbursement," and then asked, "Why, honestly, do you want me gone?" (*Id.*)

Defendants argue that Plaintiff has failed to state a claim for retaliation based upon his termination because his alleged e-mail complaint was not protected activity under the ADA. (Def. Mem. at 14-15.) Defendants contend that Plaintiff's e-mail did not "implicitly or explicitly state that [Plaintiff] felt discriminated against as a result of any alleged disability," nor did it state that Plaintiff was lodging a complaint with Defendants. (*Id.* at 14.) Thus, Defendants argue, Plaintiff's e-mail was merely an "'ambiguous complaint[] that [did] not make [Defendants] aware of alleged discriminatory misconduct,'" and, as such, it did not constitute protected activity. (*Id.* (purporting to quote *Ramos v. City of New York*, No. 96 Civ. 3787 (DLC), 1997 U.S. Dist. LEXIS 10538 (S.D.N.Y. July 22, 1997).[13])

_____

[13] Defendants have incorrectly attributed this quotation to *Ramos*; the correct citation is *Int'l Healthcare Exch., Inc. v. Global Healthcare Exch.*, LLC, 470 F. Supp. 2d 345 (S.D.N.Y. 2007).

At this stage in the action, however, Plaintiff's retaliation claim should be permitted to stand. In his e-mail, Plaintiff conveyed his belief that his hours had been wrongly reduced without any adequate explanation from company management. (EEOC Charge at 25.) He then stated that the reasons previously given to him to by management – *i.e.*, that "everyone is cutting back" – were not, in his opinion, legitimate reasons. (*Id.*) Plaintiff presented two possible reasons why his hours were reduced: (1) because the company discovered that he was disabled, or (2) because the company did not want to give him educational benefits in the form of tuition reimbursement. (*Id.*) He immediately rejected the latter of these two reasons as implausible. (*See id.* (explaining that "the hours [Plaintiff] was working [did] not warrant tuition reimbursement").) Plaintiff then demanded, again, "Why, honestly, do you want me gone?" (*Id.*) A reasonable interpretation of this e-mail is that Plaintiff believed management's proffered explanations were pre-textual, and that his hours were actually reduced because of his disability.

As this Court has explained, "[c]omplaints about conduct clearly prohibited by the statute need not mention discrimination or use particular language." *Int'l Healthcare Exch., Inc.*, 470 F. Supp. 2d at 357. Plaintiff's expressed suspicion that management reduced his hours "because [they] did a background check and found that [he] was disabled" certainly implicated conduct prohibited by the ADA. Although Plaintiff's e-mail might not have directly "complained" about such conduct, it should be deemed, at least at this early stage, sufficient to have placed Defendants on notice that Plaintiff "believe[ed] that discrimination [was] occurring." *Ramos*, 1997 U.S. Dist. LEXIS 10538, at *7. Accordingly, I recommend that the Court deny Defendant's motion to dismiss Plaintiff's retaliation claim.

5.      **Plaintiff's State and City Law Claims**

Under Section 296 of the NYSHRL, *see* N.Y. Exec. Law § 296, and Section 8-107 the

NYCHRL, *see* N.Y.C. Admin. Code § 8-107, "a defendant who actually participates in the

conduct giving rise to a discrimination claim may be held personally liable" for such conduct,

*Tomka v. Seiler Corp.*, 66 F.3d 1295, 1317 (2d Cir. 1995) (citing cases); *see also Feingold v.

New York*, 366 F.3d 138, 158 (2d Cir. 2004) ("[T]he same standards of analysis used to evaluate

aiding and abetting claims under the [New York State Human Rights Law] apply to such claims

under the [New York City Human Rights Law] because the language of the two laws is 'virtually

identical.'" (citing cases)).

The Individual Defendants have moved to dismiss these claims against them on the

ground that Plaintiff has not alleged facts sufficient to give rise to a claim of their individual

liability under the statutes.  More particularly, these defendants argue (1) that Plaintiff has not

adequately alleged that they acted in the capacity of his "employers" (*see* Def. Mem. at 16

(citing *Patrowich v. Chemical Bank*, 63 N.Y.2d 541 (1984))), and (2) that Plaintiff has not

sufficiently pleaded that they actively participated in the claimed unlawful conduct (*see id.*

(citing *Tomka*, 66 F.3d at 1317)).  Neither of these arguments justify dismissal at this stage.

First, to be held liable as an "employer" under Section 296(1) of the NYSHRL, an

individual defendant must be "a person having 'any ownership interest or any power to do more

than carry out personnel decisions made by others.'"  *Pepler v. Coyne*, 822 N.Y.S.2d 516 (1st

Dep't 2006) (quoting *Patrowich*, 63 N.Y.2d at 543-44).  Despite Defendants' contentions to the

contrary, Plaintiff's allegations do suggest that each of the Individual Defendants had the "power

to do more than carry out personnel decisions made by others." *Patrowich*, 63 N.Y.2d at 543-

44.  Plaintiff has alleged that Gregorian is the "'president of Carnegie Corporation'" (*id.* EEOC

26

Charge at 40 (quoting Carnegie's website, www.carnegie.org)), that D'Onofrio was "'chief of staff and operations, responsible for working with the president on all aspects of management, strategic planning, and oversight'" (*id.* at 39 (quoting same)), and that Bloom was "'Vice President, CAO [Chief Administrative Officer] and Corporate Secretary'" of Carnegie, responsible for providing "'strategic Human Resources leadership'" (*id.*).  Such allegations, along with Plaintiff's apparent belief that the Individual Defendants were responsible for the adverse employment actions taken against him (*see infra*), are, construed broadly, adequate to satisfy the pleading requirements of Rule 8.  *See Boykin*, 521 F.3d at 214 (stating that the complaint "need only 'give the defendant fair notice of what the . . . claim is and the grounds upon which it rests'" (quoting *Erickson v. Pardus*, 551 U.S. 89, 93 (2007) (per curiam))). Accordingly, the Court should deny Defendant's motion to dismiss to the extent the motion is based on Plaintiff's purported failure to allege that the Individual Defendants are "employers" for the purposes of Section 296(1) of the NYSHRL or the equivalent provision of the NYCHRL.

Second, Plaintiff has sufficiently alleged that the Individual Defendants aided and abetted the claimed discriminatory conduct against him.  An individual defendant may be held personally liable under Section 296(6) if he "actually participates in the conduct giving rise to a discrimination claim."  *Tomka*, 66 F.3d at 1317.  In this regard, Plaintiff specifically states that D'Onofrio "was involved in" both his reduction of hours in August 2009 and his termination in January 2010.  (Pl. Opp. at 2.)  Plaintiff also alleges that his termination was caused, at least in part, by his e-mail exchange with Bloom on January 8, 2010.  (EEOC Charge at 21-26; Pl. Opp. at 2.)  Further, Plaintiff alleges that Bloom and D'Onofrio were both present at the January 9, 2010 meeting during which Plaintiff's employment was terminated.  (EEOC Charge at 27.) With respect to Gregorian, Plaintiff alleges that, because he worked directly for Gregorian,

27

Gregorian "should have been informed of the details and terms of [Plaintiff's] termination."  (Pl. Opp. at 2.)  According to Plaintiff, if Gregorian was not, in fact, aware of Plaintiff's disability during the decision-making process regarding Plaintiff's termination, then "[Gregorian's] staff was undermining his authority and making unethical decisions without his knowledge."  (Pl. Opp. at 2.)  Construed broadly, these statements suggest that, as Plaintiff's supervisor and Carnegie's President, Gregorian should have had a role in any decision to terminate Plaintiff. (*See* Pl. Opp. at 2.)

It appears that, without the benefit of discovery, Plaintiff cannot state with certainty which of the three Individual Defendants "actually participate[d] in" the adverse employment actions allegedly taken against him.  He has, however, set forth plausible allegations that all three may have taken part.  He should therefore be permitted to name all three in his Complaint and proceed with discovery.  *See, e.g.*, *Silverman v. City of New York*, No. 98-CV-6277, 2001 U.S. Dist. LEXIS 2631, at *23-31 (S.D.N.Y. Feb. 12, 2001) (denying motion to dismiss defamation claims against nine city employees where Plaintiff needed discovery to determine which of those employees were responsible for the allegedly defamatory statements).

I therefore recommend that the Court deny Defendant's motion to dismiss Plaintiff's Section 296(6) claims, as well as his parallel claims under the NYCHRL, against the Individual Defendants.

## CONCLUSION

For all of the foregoing reasons, I recommend that the Defendants' motion to dismiss the Complaint (Dkt. 6) be granted, with prejudice, to the extent the motion seeks dismissal of the ADA claims asserted against the Individual Defendants, in their individual capacities.  I further recommend that Plaintiff be afforded 30 days to replead his failure-to-promote claim to allege

that he actually applied for a job position and was rejected. If, after 30 days, Plaintiff has not cured the pleading defect in his failure-to-promote claim, then I recommend that this claim be dismissed as well. In all other respects, I recommend that Defendant's motion to dismiss be denied.

Pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure, the parties shall have fourteen (14) days from service of this Report to file written objections. *See also* Fed. R. Civ. P. 6. Such objections, and any responses to objections, shall be filed with the Clerk of Court, with courtesy copies delivered to the chambers of the Honorable Paul A. Crotty, United States Courthouse, 500 Pearl Street, Room 735, New York, New York 10007, and to the chambers of the undersigned, United States Courthouse, 500 Pearl Street, Room 525, New York, New York, 10007. Any requests for an extension of time for filing objections must be directed to Judge Crotty. FAILURE TO FILE OBJECTIONS WITHIN FOURTEEN (14) DAYS WILL RESULT IN A WAIVER OF OBJECTIONS AND WILL PRECLUDE APPELLATE REVIEW. *See Thomas v. Arn*, 474 U.S. 140, 155 (1985); *IUE AFL-CIO Pension Fund v. Herrmann*, 9 F.3d 1049, 1054 (2d Cir. 1993); *Frank v. Johnson,* 968 F.2d 298, 300 (2d Cir. 1992); *Wesolek v. Canadair Ltd.*, 838 F.2d 55, 58 (2d Cir. 1988); *McCarthy v. Manson,* 714 F.2d 234, 237-38 (2d Cir. 1983).

Dated: New York, New York
        February 24, 2011

Respectfully submitted,

DEBRA FREEMAN
United States Magistrate Judge

29

Copies to:

Mr. Dylan G. Johnston, *pro se*
3904 South Sequoia Avenue
Broken Arrow, OK 74011

Mr. Dylan G. Johnston, *pro se*
c/o Mr. Duggal
245 Warren Street
Brooklyn, NY 11201

Joan M. Gilbride, Esq.
Kaufman Borgeest & Ryan LLP
120 Broadway, 14th Floor
New York, NY 10271