**Amended Complaint**                    **10 CIV 1681 (DF)(PAC)**

------------------------------------------------------------

Dylan Johnston, pro se

                    Plaintiff


-against-


Carnegie Corporation of New York, Ellen Bloom,
Jeanne D'onofrio, Vartan Gregorian, et al.

                    Defendants

------------------------------------------------------------

10 Civ 1681 (DF)(PAC) Johnston v. Carnegie Corp., et. al.

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: AUG 1 2 2011

PRO SE OFFICE

**UNITED STATES DISTRICT COURT**

**SOUTHERN DISTRICT OF NEW YORK**

**10 CIV 1681 (DF)(PAC)**

-----------------------------------------------------

**Dylan Johnston,** *pro se*                    **AMMENDED COMPLAINT**

       **Plaintiff**                    **Jury Trial  [x] yes [ ] no**

**-against-**

**Carnegie Corporation of New York**

**Ellen Bloom, Vartan Gregorian, Jeanne**

**D'onofrio**

       **Defendants**

-----------------------------------------------------

**Amended Complaint: 10 civ 1681**

It was unclear what the procedure for filing an amended complaint was, even after

consulting with the pro se office.

**I. Overview for Amended Complaint**

Facts of the Case are detailed in the attached EEOC complaint (**Ex. A - p.1-44**), with

information about the plaintiff (**Ex. A - p.1-2**) information about the three individual

defendants can be found (**Ex. A - p.38- 41**).

2011 AUG 12 AM 5:53
RECEIVED
SDNY PRO SE OFFICE

10 Civ 1681 (DF)(PAC) Johnston v. Carnegie Corp., et. al.

Facts of the Case used in the Report and Recommendation (**Ex. B - p.2-9**) were distilled from the claims filed and EEOC complaint.

The Report and Recommendation references *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 191 (2nd Cir. 2007) and *Jaghory v. New York State Dep't of Ed.*, 131 F.3d 326, 329 (2nd Cir. 1997), stating that "In deciding a Rule 12(b)(6) motion, the Court accept[s] as true all factual statements alleged in the complaint and draw[s] all reasonable inferences in favor of the non-moving party." (**Ex. B - p.10**)

Facts of the Case assumed to be true in the Report and Recommendation (**Ex. B - p2-9**) were uncontested by the defendants. On March 21, 2011 defendants' stated:

> "We write this letter to inform the Court that, after careful consideration, defendants will not be submitting objections to Magistrate Judge Freeman's Report and Recommendation." (**Ex. C p.1**)

Therefore defendants accept as true the facts of the case assumed to be true in the Report and Recommendation. Facts of the case from Report and Recommendation established that retaliation claims should survive the motion to dismiss for all defendants, including individual defendants, under both NYSHRL and NYCHRL; however, the retaliation claims at the Federal level that survived the motion to dismiss were solely those claims against the corporation.

10 Civ 1681 (DF)(PAC) Johnston v. Carnegie Corp., et. al.

Facts of the Case that remained uncontested by defendants were further distilled and ordered by Judge Crotty (**Ex. D – p.2-4**).

Facts of the Case contained in the EEOC complaint were not contested in the defendants' previous motion to dismiss (on record), which relied solely upon the severance letter which was found to be questionable. Using the Bormann factors, the facts of the dismissal and terms puts into question whether the waiver was enforceable. (**Ex. B – p.18**) and "most importantly, this Court has repeatedly held that a release agreement cannot serve to bar federal discrimination claims where, as here, there is a legitimate dispute about the amount of consideration due under that agreement." (**Ex. B – p.18**)

The defendants also suggested that there was a "failure to state a claim upon which relief may be granted", which assumes that "even if everything stated in the complaint were true, the defendant did not cause injury to the plaintiff that the law recognizes." (**The 2007 Manual for Pro Se Litigants Appearing Before the United States District Court for the Southern District of New York states that p.109**) states:

> "…a motion to dismiss for failure to state a claim is not appropriate if the defendant wants to argue that the facts alleged in the complaint are not true. Instead, the defendant in a motion to dismiss the complaint for failure to state a claim assumes that the facts alleged in the complaint are true but argues that those facts do not constitute a violation of any law."

10 Civ 1681 (DF)(PAC) Johnston v. Carnegie Corp., et. al.

In addition, Facts of the Case were not addressed in defendants' affirmative defenses—
the affirmative defenses was a laundry list of general defenses used to limit liability and
had no indication of which specific claims they were intended to address, whether those
of the claims that survived the motion to dismiss or the restated claims or all claims.

The statements given in my March 9, 2011 (**Ex. E**) submission to the court with response
and objections regarding the Report and Recommendation were deemed by Judge Crotty
to be factual clarifications and that they were to be included in this amended complaint
(**Ex. D – p. 10**). These statements address the defendants' questionable pattern and
practice of unemployment practices. Within the organization, other members of protected
classes had been handled in a questionable manner. (**Ex. E - p. 2**), It would be
unreasonable to dismiss such issues without discovery. Summary of pattern and practice
of discrimination can be found here (**Ex. E - p.5, Ex. A - p.15-17,** ).

In addition to facts in the EEOC complaint regarding failure to promote (**Ex. A -
General**), appended are submissions on April 7, 2011 (**Ex. F**) April 27, 2011 (**Ex. G**)
detailing a failure to promote. In addition to restatement of failure to promote claims,
additional supporting information for retaliation and failure to promote claims is included
in this summary of the amended complaint.

10 Civ 1681 (DF)(PAC) Johnston v. Carnegie Corp., et. al.

**II. Procedure**

Because administrative options have been exhausted claims are being filed pursuant to

Federal ADA, NYSHRL, NYCHRL, and FLSA.

The EEOC issued a right to sue letter in November 2009 (**Ex. H**) after closing the charge

without investigating the claims (**Ex. I – p.1 paragrph 5**).

Defendants elected not to pursue their preferred method of dispute resolution, non-

binding mediation (**Ex. J - p.3**) despite being clearly aware of dispute and offer for

resolution out of court from EEOC complaint (**Ex. A - p.1**) and subsequent letter sent to

the board on December 16, 2009 (**Ex. K**).

As discussed in initial conference with Judge Freeman on July 13, 2011, although

defendants' council requested discussions of settlement on June 9, 2011 (**Ex. L - p.1-2**),

defendants have not been forthcoming with information that would lead to reasonable

quantification of damages (**Ex. L - p.3, see also Initial Conference transcript on

record**). It has been agreed upon with defendants that any such discussions proceed in

tandem with court proceedings.

Despite a discussion about court mediated settlement, a concern is that of defendants

using the public court system as a venue for what would otherwise be private mediation,

10 Civ 1681 (DF)(PAC) Johnston v. Carnegie Corp., et. al.

and having the case sealed after a settlement is a concern. A protective order due to plaintiff's private health information was discussed in initial conference (**See transcript on record**), however it is unclear what the best possible course in balancing the issue of privacy of medical records and transparency for public interest.

### III. Summary of Timeline

    A)        November 2006, Plaintiff interviews for publications internship at corporation, is instead hired as intern to organize periodicals for corporation's president, individual defendant Gregorian (**Ex. M**).

    B)        No terms of duration of internship are specified from outset.

    C)        Hours were set for twenty per week.

    D)        Plaintiff continues to work for president's office until termination in January 2009.

    E)        Plaintiff works additional time for president Gregorian on site at the corporation after termination for free in January and February 2009 to finish projects for promised work and educational recommendations.

10 Civ 1681 (DF)(PAC) Johnston v. Carnegie Corp., et. al.

F)      In addition to work from 2006-2009 in the president's office, plaintiff
        is asked to work for investments office. First in 2007, temporarily in
        corporation's investments office during summer. Plaintiff starts regular
        schedule working ongoing in the investments office starting January
        2008 until termination in January 2009.

G)      The weeks of June 11 and June 18, 2007 plaintiff works for two weeks
        at 35 hours per week as working as a temp filling in for assistant Ms.
        Carolyn Bido and executive assistant in investments Ms. Ariane Leung
        who are both vacationing those two weeks (**Ex. N**).

H)      Parties notified were individual defendant Chief of Staff Ms. Jeannie
        D'onofrio (individual defendant), Loretta Graff for human resources, as
        well as all staff in the investments department (**Ex. N**).

I)      Work for investments included general administrative functions such as
        opening and distributing mail, answering phones for four investments
        directors, distribute circulating documents within the department,
        restocking supplies, scan library of investments committee binders for
        future database entry. (**Ex. O**).

J)      January 2008 Plaintiff is asked by individual defendant D'onofrio if he
        would be interested working more hours for investments.

10 Civ 1681 (DF)(PAC) Johnston v. Carnegie Corp., et. al.

K)      Ms. Bido has been transferred from investments department to finance
        because of 'incompatibility' with executive assistant for investments
        Ms. Ariane Leung.

L)      Plaintiff agrees and commences working investments office with duties
        similar to those previously done during the temporary placement in
        2007 in addition to his ongoing work for the president's office.

M)      Plaintiff works approx 30 hours (**Ex. J – p.1**) for investments office
        through November 2008, shy of Corporation's full time week of 35
        hours (**Ex. Handbook III-2**).

N)      January 28, 2008 plaintiff discusses terms of open investments
        associate position with then HR director Ms. Loretta Graff (**Ex. P**).

O)      January 30, 2008 plaintiff submits resume per Graff's request for
        application for position (**Ex. Q - p.1**).

P)      January 30, 2008 plaintiff is informed that there was a large pool of
        applicants (**Ex. Q - p.1**) and on interviews have not yet commenced as
        of February 11 (**Ex. Q - p.2**).

10 Civ 1681 (DF)(PAC) Johnston v. Carnegie Corp., et. al.

Q)      Individual defendant Jeanne D'onofrio suggests to plaintiff that he does

not want to work as investments associate under investments executive

assistant Ariane Leung (**Ex. E - 3, Ex. A – p. 10-12**).

R)      Once interviews commence, interviewees later have closed door

meetings with all other investments staff.

S)      Rebecca Zinn interviews in June 2008 after plaintiff had withdrawn

application for position following advice of individual defendant

Jeanne D'onofrio.

T)      Executive assistant Ms. Leung is generally more affable with plaintiff

after application is withdrawn, even sending a Christmas card in

December 2009 thanking plaintiff for all his help in the investments

office (**Ex. R**)

U)      Rebecca Zinn is hired after application is withdrawn, starts at

corporation shortly after interviews.

V)      Plaintiff continues ongoing employment in the investments office to

help Ms. Zinn transition into the position.

10 Civ 1681 (DF)(PAC) Johnston v. Carnegie Corp., et. al.

W)    Ms. Zinn was supposed to take over administrative work plaintiff was doing but never did.

X)    Ms. Zinn's duties were essentially similar to those of plaintiff but they were compensated differently. (**Ex. A p.22-23**).

Y)    Defendant was already managing all hard copy originals and scanning for later database management.

Z)    Employee of the corporation, [redacted]**,** in an instant messenger conversation with the plaintiff in August of 2009 stated that the investments associate position was mostly "data organization … but [Ms. Zinn] didn't really end up doing that" and that Ms. Zinn had "left before we could really ramp her up".

AA)   Ms. Zinn was hired by the corporation under the impression that she was not pregnant. Ms. Zinn disclosed this after hire.

BB)   Shortly after Ms. Zinn began working at the corporation she was in office infrequently due to a troubled pregnancy and took maternity leave shortly after commencing working at the corporation. Ms. Zinn was spoken of disparagingly in her absence.

10 Civ 1681 (DF)(PAC) Johnston v. Carnegie Corp., et. al.

CC)    The work wasn't especially difficult, and considering plaintiff knew what sort of system was in place for originals and familiar with operations. Plaintiff was still passed over for filling position in absence.

DD)    The same employee (referenced in point Z) stated in the August 2009 instant messenger conversation that "it's something you could have done" and that  rather than working with executive assistant Ms. Leung,

EE)    The investments associate would have been working with the two investments analysts (**Ex. S**).

FF)    Plaintiff was told before withdrawing application for the investments associate position by individual defendant Jeanne D'onofrio that the position would be working under executive assistant Ms. Leung.

GG)    Individual defendant Ms. D'onofrio had previously advised plaintiff that he did not want to work for Ms. Leung. Plaintiff was being steered away from the position by the individual defendant Ms. D'onofrio (**Ex. - A p.10-11**).

10 Civ 1681 (DF)(PAC) Johnston v. Carnegie Corp., et. al.

HH)      The same instant messenger conversation in 2009 the employee
         [redacted] stated that finding a replacement for my work in the
         investments office took about "a month or two"(**Ex. T**)

II)      After plaintiff was terminated in January 2009, the position in
         investments was not eliminated as defendants describe in severance
         letter (**Ex. J - p.1**)

JJ)      Plaintiff was wrongfully terminated under false pretense and quickly
         replaced.

KK)      The termination was under a false pretense to fire a person in a
         protected class immediately after protected speech.

LL)      The severance letter was used for wrongful termination.

MM)      A contract used for an illegal purpose is void.

NN)      The severance document as a whole is fraudulent and written with the
         intent to deceive.

OO)      Defendants claim that position was being eliminated. The position was
         not eliminated and additional positions also became available.

10 Civ 1681 (DF)(PAC) Johnston v. Carnegie Corp., et. al.

PP)     The corporation handbook states that "if reorganization results in the elimination of the position to which a staff member is assigned and if suitable alternative work cannot be offered by the corporation, the staff member will receive as much advanced notice as possible but not less than one month." (**Ex. Handbook III-13**)

QQ)     The policy implies that suitable work, if available will be considered for the employee.

RR)     There was suitable work available. Shortly after plaintiff was terminated, defendants also hired permanent admin in the president's office as well as another grants records assistant in another department (**Ex. U p.2**).

SS)     Temporary help was also hired shortly after plaintiff was terminated (**Ex. U p.1**).

TT)     Plaintiff was not offered such alternatives.

UU)     When Ms. Zinn was hired and compensated differently for essentially similar work, she disclosed her pregnancy and was temporarily disabled.

10 Civ 1681 (DF)(PAC) Johnston v. Carnegie Corp., et. al.

VV)    Ms. Zinn was kept in the position title and was given maternity leave.

WW)    In her absence, Ms. Zinn was spoken of begrudgingly because of her taking maternity leave.

XX)    June 2008 plaintiff meets with individual defendant D'onofrio and is aware of plaintiff's condition and disability (**Ex. V, Affidavit, Ex A p.7**).

YY)    Individual defendant Gregorian was likely aware of medical condition as well (**Ex. A-20**)

ZZ)    November 2008, Plaintiff was told to work fewer hours, no more than 20 per week.

AAA)    Conflicting explanations for reduction of hours were given by individual defendant Ms. Bloom, that everyone is making cutbacks and they did not want to pay plaintiff benefits, we might not even get bonuses this year, you are not going to land here, etc.

BBB)    In November 2008, plaintiff was rushed into filling out paperwork for an employer opening deposit for a TIAA-CREF retirement account.

10 Civ 1681 (DF)(PAC) Johnston v. Carnegie Corp., et. al.

The initial deposit was $3,000. In November 2010, defendants send plaintiff letter explaining that after an audit it was discovered that they owed additional funds for retirement account and deposited $2839.10 accordingly.

CCC)   Plaintiff was only told by former Human Resources dir. Ms. Loretta Graff that the retirement account was opened because I had worked over 1,000 hours for the year.

DDD)   Plaintiff filled out allocation paperwork and also filled out paperwork requesting $50 per-paycheck auto-draft contributions subtracted from paycheck to be made toward retirement account pre-tax.

EEE)   Payments were never made accordingly.

FFF)   Plaintiff was asked by Chief Investments Officer Ms. Shuman if he would work more for investments. Plaintiff agreed. Ms. Shuman spoke with Ms. Bloom, possibly others involved in making such decisions and was told no immediately. No reason was given for the decision.

GGG)   January 8, 2009 Plaintiff asks for raise because he had been working in the service of the corporation for almost two and a half years without a change in compensation.

10 Civ 1681 (DF)(PAC) Johnston v. Carnegie Corp., et. al.

HHH)   Plaintiff is denied raise and told to look for work elsewhere because
they were encouraging plaintiff to do so with reduction of hours (**Ex.
W-1**).

III)   January 8, 2009 Plaintiff complains of discrimination in email
following denial of raise (**Ex. W-3**).

JJJ)   Individual defendant Bloom was then aware of plaintiff's disability due
to content of email, and because of her extensive human resources
background (**Ex. A-39**) Individual defendant Bloom should have been
on notice that such a complaint constitutes protected speech and should
be addressed according to legal statutes and corporation's personnel
policies.

KKK)   January 9, 2009 Plaintiff is called into meeting with individual
defendants Ms. Bloom and Ms. D'onofrio.

LLL)   January 9, plaintiff it was unnecessary to return to work because of
non-working notice through March 13, 2009.

10 Civ 1681 (DF)(PAC) Johnston v. Carnegie Corp., et. al.

MMM)    Plaintiff was pressured to sign non-disclosure document releasing the

Corporation and individual defendants from any and all claims against

them (**Ex. J – p.3**).

NNN)    Plaintiff was told that after the corporation would substantiate a claim

for unemployment insurance if the severance letter was signed.

OOO)    January 2009, plaintiff receives request to continue to organize

periodicals for individual defendant president Gregorian despite having

been told by individual defendants Bloom and D'onofrio that it would

no longer be necessary to return to work. (**Ex. X**)

PPP)    February 27, 2009 plaintiff's final day working for president Gregorian

for free.

QQQ)    October 2009 Plaintiff files EEOC Complaint.

RRR)    October 2009, Plaintiff is informed by Chief Investments Officer

Shuman that she would not be able to write recommendation for

defendant for application for grad school because she had been advised

not to be in contact with plaintiff (**Ex. Y - p.1**), despite a good work

relationship, appreciation for plaintiff's collegiality (**Ex. Y**) and despite

previous offer to write a recommendation for grad school.

10 Civ 1681 (DF)(PAC) Johnston v. Carnegie Corp., et. al.

SSS)      November 2009 Defendant is issued right to sue letter by EEOC after agency declines to investigate defendant's complaint (**Ex. H**)

TTT)      December 2009 Defendant writes letter to board of corporation informing board of corporation of EEOC complaint and requesting inquiry into terms of employment. (**Ex. K**)

UUU)      January 2010 Defendant files complaint in court of SDNY (**On record**).

VVV)      November 22, 2010 Defendants realize they even made a mistake in their calculations of what was due at the time of termination, making a deposit to the Carnegie Corporation of New York Defined Contribution Retirement plan in the amount of $2839.10 as a "result of a review of [the corporation's] plan contributions in which you were eligible during the time of your employment during 2008 and 2008." (**Ex. Z**)

## IV. Defamation

Defamatory article about case with clear anti-plaintiff bias appears as a sponsored result on web sites, search results (**Ex. LL**) distributed online by electronic media providers that

10 Civ 1681 (DF)(PAC) Johnston v. Carnegie Corp., et. al.

do "risk assessment" and provide "online media solutions" for companies for controlling image and branding. (**Ex. AA**)  The (1) defamatory statements in the "facts of the case" section of the article that are contrary to those ordered by the court were (2) published to third parties; and (3) the publications were third-party payees for advertisements for the articles to be published, the speaker or publisher knew or would have known the statements were false, regardless of the site terms and conditions, as would the authors and defendants or associates who commissioned the article.

### V. Summary of Adverse Actions During Employment

A) January 9, 2009, plaintiff was terminated immediately following protected action of complaint of discrimination.

B) Corporation procedure for handling a complaint (**Handbook III-1)** of discrimination was not followed after defendants' complaint.

C) Plaintiff's request for raise in compensation on January 8, 2009 for work of increasing responsibility over two and a half years was denied immediately without review of performance despite matter of course increases for other employees during period plaintiff was employed at corporation and overall increase in compensation budget.

10 Civ 1681 (DF)(PAC) Johnston v. Carnegie Corp., et. al.

D) Chief Investments Officer Ms. Shuman requested from individual defendants in January 2009 that plaintiff work more for the investments department. Request was denied immediately without review.

E) Plaintiff's hours were reduced to encourage him to find other work.

F) Plaintiff given multiple pretextual reasons for reduction in hours.

G) Plaintiff given reason for reduction in hours of not wanting to give benefits to employee.

H) Plaintiff steered away from full-time position by individual defendant D'onofrio.

I) Further issues of retaliation described in email dated of request for raise being denied (**Ex. W**) despite compensation budget increases year on year from annual reports from 2006 (**Ex. BB**) to 2009 (**Ex. CC**).

## VI. Supporting Facts for Subjective Nature of Review of Employee's Performance

A) Plaintiff only received one performance evaluation during entire course of employment from 2006 to 2009.

10 Civ 1681 (DF)(PAC) Johnston v. Carnegie Corp., et. al.

B)   Plaintiff's only evaluation was with Ms. Jeanne D'onofrio in 2007 at approximately the six month mark after commencing internship in president's office.

C)   Plaintiff's request for raise, and Chief Investments Shuman's request for plaintiff to work more for investments office were both denied immediately without review.

D)   The fact that these dismissals were made off-hand and immediately gives reason to believe that plaintiff's January 2008 application for the full-time investments associate position may have been immediately dismissed in the same way by defendants without review.

E)   Without the benefit of discovery and depositions it would be difficult to determine whether the plaintiff's application was dismissed in a similar manner that plaintiff's employment was generally handled.

## VII. Restatement of Failure to Promote Claims

There were generally questionable practices, but especially in plaintiff's case. Leadership has admitted that a review of its actions and policies was necessary even

10 Civ 1681 (DF)(PAC) Johnston v. Carnegie Corp., et. al.

proclaiming as much publicly. Following my complaint of discrimination and subsequent termination in 2009, a section of "governance and policies" on the corporation's website features uploaded, updated versions of the corporation's policies featuring equal employment opportunity first in the list, followed by freedom from harassment, conflict of interest, code of ethics, whistleblower, etc (**April 7 submission to court on record**).

Regarding establishing a pattern or practice of unfair employment practices it would be premature to dismiss the claim of failure to promote without the benefit of discovery. This is discussed in detail in a March 9, 2011 letter to the court (**Ex. E – p.2**).

Within the organization other members of protected classes had been discriminated against. During my time working at Carnegie, three retirement-age staff members left the corporation almost immediately after Ms. Bloom was hired—Dorothy Dellman, who clearly did not want to leave, had a heart attack shortly after she was retired in 2008. Ed Sermier, was drunk at the corporation's 2008 Christmas party and interrupted the company announcement regarding his retirement by something along the lines of he's looking forward to retirement as long as the retirement package isn't changed. Ms. Loretta Graff in human resources who was also replaced in 2008 seemed a bit lost when asked about what she was going to do next.

10 Civ 1681 (DF)(PAC) Johnston v. Carnegie Corp., et. al.

In addition, women who took maternity leave may have had similar issues. Ms. Zinn, who was hired for the Investments Associate position took maternity leave because of her troubled pregnancy. In her absence she was talked about disparagingly, and after her maternity leave she did not return to her position at the corporation. Also, a woman in the mailroom Tiffany [unsure of last name] was terminated after returning from her maternity leave. Jeanne D'onofrio or possibly another assistant in the president's office referred to a former staff member that was "crazy" who was terminated because she had been belligerent. I am unsure if this experience had shaped some perception of how a mentally ill person would generally behave.

It would be necessary to review records, correspondence, statements, defendants' depositions, and statements from the former employees, before being able to make a determination of whether or not these incidents were simply a matter of course for how the defendants do business or if they constituted more serious offenses.

Regarding steering me away from the position, the investments associate position did not end up reporting to the executive assistant as I was told, but was to work more closely with the investments analysts. After I withdrew my application for the position Ms. Leung was more affable and I even received a thank you note for all of my work and performance from Ms. Leung. It was peculiar that such suggestions about my not wanting to work with. Ms. Leung was described as "difficult" to work with and her previous assistant, Carolyn Bido, had been transferred to another department. Ms. Bido had confirmed this. Ms. Bido is no longer with the corporation.

10 Civ 1681 (DF)(PAC) Johnston v. Carnegie Corp., et. al.

The human resources titles were somewhat confusing (**Ex. E – p. 3**) and the way policies were followed were generally opaque.

Pretextual reasons for the termination cutbacks (**Ex. E – p.3**) one of the reasons given was "cutbacks". From the time of my hire in 2006 to the end of 2009 the budget for compensation increased despite the financial crisis. iIn three years the budget went from 8,450,350 in 2006 to 10,281,690 in 2009, and 18% increase. Benefits increased from 3,293,931 to 4,064,964 – almost 19%.

Financial reports attached (**Ex. BB, CC**) from http://www.carnegie.org/about-us/financial-information/report-on-finances/ However my compensation remained the same throughout my time at the organization even though I progressively had more duties and had been working at the corporation for some time. When I did request a raise, I was rejected which was kind of the last straw that precipitated my complaint of discrimination. Regarding the budget, granted, some additional hires were made, but several people were also terminated, resigned, or retired.

In addition the Vice president, CAO, and Corporate Secretary and the Director of Human Resources, were required to discuss the complaint with an employee per corporation policy. One of the individual defendants Ms. Bloom has held each of those positions during the time that the plaintiff was working at the corporation.

10 Civ 1681 (DF)(PAC) Johnston v. Carnegie Corp., et. al.

The then Human Resources Director Ms. Nilufur Satic was not involved in the
meeting where I was asked to sign the severance letter in January 2009.

I did apply for a specific position "Investments Associate". I met with Ms. Loretta
Graff (Human Resources in January 2008) to ask about the details of the position and
she suggested that I send an updated resume to apply for the position.

It is premature to dismiss the failure to promote because, although I withdrew my
application at a later date, it may have been rejected offhand without review or
without being included into the applicant pool or properly given preference to
external applicants according to policy and would constitute a rejection of my
application. Considering the immediate response in denying a raise, and the
immediate response about CIO Ellen Shuman's request that I work more for the
investments office, it is plausible that the application for the Investments Associate
position was rejected in an offhand immediate manner. The consideration of CIO Ms.
Shuman's request that I work more for investments, and the consideration that that
my request for a raise was immediately both denied immediately without review
suggests that the procedures in the corporation were not followed but were simply
subjective reactions. (**Ex. E – p.5**).

There was no coherent and consistent explanation for the reduction in hours, lack of
benefits during the time I had been working or the reason for not compensating

10 Civ 1681 (DF)(PAC) Johnston v. Carnegie Corp., et. al.

accordingly for past due compensation, denial of a raise, improperly addressing my

complaint, the termination, and the request from president Gregorian for me to

continue to finish some work for him in the president's office despite

It would only be possible to verify this through discovery of why these requests were

dismissed offhand and if there is no documented information available through

discovery as to why the decisions were made, the opacity of the decisions in human

resources even in internal records would seem to indicate a subjective. So the process

in the human resources would be difficult to describe as objective without this

evidence. My complaint to management about discrimination was equally quick and

it would not be unreasonable to find out what the reaction to my withdrawal of the

application would have been as well.

I submitted and updated resume on January 30 2008. The response from Ms. Graff on

January 30 suggested that included my application with others in the pool but an

email on February 11, suggests they were unsure of who would be chosen for

interviews.

I was given one performance evaluation in early 2007. Despite being there two and a

half years there were no other formal evaluations. The letter regarding severance

states that I was a valued employee (**Ex. J – p.1**). Why then was I terminated

immediately?

10 Civ 1681 (DF)(PAC) Johnston v. Carnegie Corp., et. al.

When I requested compensation for doing more work that what I was originally hired
for on January 2009, the request was immediately denied.

Because of the immediate rejection of request it is possible that it would have bene
pointless to apply for any further positions with the corporation or keep my
application in for a position.

Chief Investments Officer Ms. Shuman did not give me a reason for the denial of her
request that I work more for investments office and she seemed visibly upset from the
exchange she had with individual defendant Ms. Bloom or whoever else was involved
in the decision made about the request. Ms. Shuman also told me that she was sorry
and that I did not want to work at Carnegie anymore.

Other employees seemed to be promoted as a matter of course for the length of time
they were at the corporation and the increase in responsibility. Mr. Rozolsky in
investments was promoted form analyst to senior analyst after he took on more
responsibility in the department.

Several temporary assistant were brought in and out of the president's office during
my time at the corporation. One LaShawn Davis was hired full time and left a few
short months later. After my termination an intern in the president's office who had
less experience at the corporation that I did was hired on as an admin assistant in the
president's office.

10 Civ 1681 (DF)(PAC) Johnston v. Carnegie Corp., et. al.

## VIII. Failure to Promote Summary

A)   Considering how the terms of employment were generally handled contrary to the company's policies, Federal ADA standards, NYS HRL, NYS HRL, and FLSA, there would have been no point to apply or further keep an active application in for positions with the corporation.

B)   There may also be a general pattern and practice of unfair employment practices during my time at the corporation.

C)   An instance of defendants' failure to promote was in January 2008, when plaintiff was asked to work additional hours for investments. Although plaintiff was working over 20 hours per week, which would have made plaintiff a part-time salaried employee with benefits (**Handbook at III-2**). However plaintiff was still used as an intern.

D)   The defendants did not change the terms of plaintiff's employment, compensation, or status according to company policy regarding these issues (**Handbook at III-2**).

10 Civ 1681 (DF)(PAC) Johnston v. Carnegie Corp., et. al.

E)    In general, terms of my employment did not generally follow procedure
      according to the corporation's policies regarding employees
      (**Handbook, General**).

F)    Nor was compensation for employment reviewed annually per policy
      (**Handbook at III-3**) Which states that salary adjustments are made
      based on the level of the total budget, trends in the New York City
      labor market, and the comparison of Corporation pay scales to those of
      other nonprofit organizations, and profit-making organizations, where
      appropriate. Increases are based on merit, revised or additional
      responsibilities and skills. They are effective at the beginning of the
      corporation's fiscal year, which is October 1, subject to the approval of
      the planning and finance committee."

G)    For example, I was not given regular performance evaluations
      (**Handbook at III-4**).

H)    Nor were transfers and promotions handled according to policy (**Ex.
      Handbook at III-11**). When a position becomes available "Current
      staff members will be given preference for promotional opportunities.

I)    Corporation policies and procedures for addressing my complaint,
      "[The human resources director] and the vice president and chief

10 Civ 1681 (DF)(PAC) Johnston v. Carnegie Corp., et. al.

administrative officer and corporate secretary will ensure that the

corporation investigates the complaint and takes appropriate steps to

remedy any violation found to have occurred." (**Ex. Handbook III-1**).

J)    Then Human Resources Director Ms. Nilufer Satic was not involved in

the meeting.

K)    Whether the president was consulted regarding termination and aware

of it before it was happening is a matter subject to discovery.

L)    The defendants stated that the termination was due to "position

elimination" (**Eex. J – p.1**) Corporation policy for position elimination

is at (**Ex. Handbook III-13**) was not followed.

M)    The discretionary severance pay plan was not followed according to

corporation policies (**Handbook III-14**).

N)    The question of whether or not plaintiff was an intern complicates this

matter. Interns, it seems would not have been eligible for severance

payment.

O)    Part-time employees are covered after three months (**Handbook III-**

**14**) and the details of the discretionary severance plan can be seen at

10 Civ 1681 (DF)(PAC) Johnston v. Carnegie Corp., et. al.

(**Ex. III-14**). After plaintiff's hours were reduced, was he demoted to intern?

P)      Plaintiff was denied promotion to part-time salaried employee during the period he was working in investments as an intern when he should have been considered an employee.

Q)      The terms of plaintiff's employment have been are complicated by the conflicting treatment of stating upon my leaving that he was to be a "project intern" but being offered severance which is only given to part and full-time employees.

R)      The calculation of severance was also questionable as to whether it followed corporation policies.

S)      In addition to these matters, "The [Discretionary Severance Pay Plan] does provide that if a regular employee's employment with the corporation is involuntarily terminated due to a job elimination, reduction in force, or corporate downsizing (a "position elimination), such employee may receive severance pay, but only if such employee who resigns, retires, dies, or is discharged for cause or disability may not be treated as having incurred a position elimination."

10 Civ 1681 (DF)(PAC) Johnston v. Carnegie Corp., et. al.

T)      Calling plaintiff's position an internship is also problematic. Plaintiff's
        starting position in 2006 was as an "intern". Plaintiff's final position
        title given on the severance letter when terminated in 2009 was "project
        intern" (**Ex. J – p.2**).

U)      If position had been an internship, it does not meet the general
        guidelines of what an internship constitutes according to the Fair Labor
        Standards Act (FLSA general, and (**Ex. DD**). I am unclear if there is
        any state or local statutes about this type of employment.

        i) For example, it was not of a fixed duration that was set before
        the work began.

        ii.) It consisted of performing ongoing routine work for the
        organization on a regular and recurring basis.

        iii.) My employment was also augmenting regular workforce, I
        should have been considered a regular employee.

V)      There was a general pattern and practice of unfair employment
        practices, it would have been pointless to apply or keep an application
        in for any open positions.

10 Civ 1681 (DF)(PAC) Johnston v. Carnegie Corp., et. al.

W)     For example "position elimination" was used to eliminate aged
       employees.

X)     Dorothy Delman, long time employee of the corporation left shortly
       after Ms. Bloom was hired. "Her duties in the corporation were
       subsumed by other positions within the corporation" during
       administrative restructuring is what the global all_staff email
       suggested. (**Ex. A-16**).

Y)      Loretta Graff retired but when asked about what she was going to do,
       she seemed confused.

Z)     Edward Sermier, former Corporate Secretary's retirement was
       announced at a corporation Christmas party in 2008. He boisterously
       interrupted the announcement regarding the retirement saying
       something along the lines that he was looking forward to retirement as
       long as the terms of the corporation retirement package were not being
       changed (**Ex. EE**).

AA)    Chief Investments Officer Ms. Shuman's request that plaintiff work
       more for investments was immediately denied by those responsible for
       human resources decisions, even though there was an apparent need for
       the department.

10 Civ 1681 (DF)(PAC) Johnston v. Carnegie Corp., et. al.

BB)     The same work for the position was available and given to a series of
        temps after plaintiff left.

CC)     While finishing work for individual defendant president Gregorian
        after my termination an email exchange reveals that employees in the
        investments office were given misinformation about why I was leaving
        (**Ex. FF**).

DD)     Employees in the investments office were told that I was leaving
        because I was dissatisfied with an offer of part-time employment with
        the corporation. (**Ex. FF**).

EE)     If I had recently been offered part-time employment and not
        terminated, it was news to me. Because things were so awkward, I did
        not really know how to respond.

## IX. Defendants' Affirmative Defenses

Defendants had suggested that I was not aware of the position's responsibilities, not
qualified for the position, however, I met with then human resources manager Loretta

10 Civ 1681 (DF)(PAC) Johnston v. Carnegie Corp., et. al.

Graff to discuss the particulars what the position's duties entailed on Monday January 28, 2008 (**Ex. P**). Defendants suggest I was not qualified for the position; however, Ms. Graff suggested that I submit an updated resume to apply for the position (**Ex. P**).

Defendants suggest position elimination was the reason for termination in January. Defendants hired temporary help shortly after I left, addressed in letter sent to court on September 14, 2010 (**Ex. GG**). At least two fulltime positions opened shortly after termination, an administrative assistant was hired in the president, a previous intern with less experience at the corporation that the plaintiff. A grants records assistant was also hired.

Defendants suggest that termination was voluntary. Why on earth would anyone voluntarily leave a steady gig in that kind of job market, or the current one for that matter?

Defendants suggest they have fully complied and continue to comply with applicable Federal and State laws. Is it the letter of the law or the spirit, and are they not also complying with NYC HRL?

Defendants have suggested I am not disabled within the meaning of ADA, NYHRL, or NYC HRL. The attached statement from the Social Security Administration (**Ex. HH**) states a permanent disability is due to "affective disorders". Which was explained to the

Page 35 of 41

10 Civ 1681 (DF)(PAC) Johnston v. Carnegie Corp., et. al.

plaintiff by a representative of the administration to be used as a catch-all term for

psychiatric disorders.


Defendants suggest that I was terminated due to legitimate business reasons. Although

making cuts was a reason I was given, year on year total compensation for employees

increased from 2006-2010 (**Ex. BB, CC**). I was told by an employee that a series of

admin temps were hired for the investments office shortly after I left.  I did not have

regular performance evaluations like other employees and there was no meeting related to

poor performance prior to termination.


Defendants suggest that I did not suffer 'adverse employment action'. Adverse

employment actions include: termination do to complaint of discrimination, reducing

hours because they do not want to pay benefits to a disabled employee, unusual work

circumstances such as being moved to different parts of the office five times for the

president's office and not having a steady work space in the investments office,


The corporation's full time status is afforded to employees working over 35 hours per

week (**Handbook at III-2**). A few hours difference from average used in calculating

severance (**Ex. J**).


Defendants suggest that "plaintiff cannot recover punitive damages because Defendant

complied with all applicable statues at all relevant times." "Defendant", singular. Which

10 Civ 1681 (DF)(PAC) Johnston v. Carnegie Corp., et. al.

defendant did comply and which ones did not? Defendants are individually liable
according to NYHRL and NYCHRL to statues (**Ex. B - p26-27**).


Defendants suggest that plaintiff could not have satisfied "the essential requirements of
his position with or without a reasonable accommodation." If plaintiff could not have
satisfied the essential requirements of light admin and information management, plaintiff
will eat his own foot.

10 Civ 1681 (DF)(PAC) Johnston v. Carnegie Corp., et. al.

**X. Remedy Sought**

Defendants have failed to mitigate any damages by opting not to use their own preferred method of dispute (**Ex. J p.3**).

Plaintiff seeks the equivalent of the following specific damages and others that may appear during discovery period, as well as unspecified general damages.

Despite defendants' request for settlement on June 10, 2011 the defendants have not been forthcoming with information that would help me quantify an amount of specific damages.

This and other factors have made any such resolution difficult to address, and the problems caused by the termination and protracted litigation have continued to make such resolution impossible without the help of the court or legal respresentation.

The plaintiff's lack of understanding of procedural and case law adds to the complications of the protracted legal process, the number of defendants, the multiple claims at federal, state, and local levels—all make it difficult to articulate relief sought.

10 Civ 1681 (DF)(PAC) Johnston v. Carnegie Corp., et. al.

Ultimately I must rely on unspecified such relief as the court deem appropriate for back

compensation due, revised terms of employment, disruptions in life, setbacks in early

career, protracted litigation, etc.


### Remedy Sought

A.  A monetary award of total back pay to date less amounts previously

paid to plaintiff as wages from January 2008 to January 2009.


B.  Award of or equivalent to back benefits, itemized as described in the

Corporation **Handbook IVX p1-28**)

   i. annual physical examination IVX-1

   ii. dental insurance IVX-2

   iii. health and hospital insurance IVX-3

   iv. prescription coverage IVX-4

   iv. vision care IVX-4

   v. COBRA IVX-5

   vi. Long-term Care Insurance IVX-6

   vii. Employee Assistance Program IVX-7

   viii. Long-term Disability Income Insurance (TIAA) IVX-8

   ix. Worker's Compensation Insurance IVX-8

   x. Business Travel Accident Insurance IVX-9

   xi. Decreasing Term or Collective Life Insurance (TIAA)

      IVX9

10 Civ 1681 (DF)(PAC) Johnston v. Carnegie Corp., et. al.

                      xii. Group Life Insurance (TIAA) IVX-10

                      xiii. Supplemental Pension Plan

                      xiv. Flexible Spending Account IVX-13-18

                      xv. Tuition Payments IVX-26

                      xvi. Museum of Modern Art pass card, Cooper-Hewitt

                            Museum pass card, New York Philharmonic and

                            TDF discount rate

                      xvii. Corporate Care System discount

                      xviii. TransitCheck Program IVX-30

                      xix. Medical Leave

C. Proper 1 exemption withholdings for state and federal taxes will be arranged by employer for amounts of back compensation value subject to taxes

D. Employer's standard matching contributions to TIAA-CREF retirement account IVX-11, with additional percentage of matching contributions corresponding to gains made on investments in each equity class selected for retirement plan during the time period that matching contributions should have been disbursed until present date

E. Fifty dollars each two week pay period till present in tax free

10 Civ 1681 (DF)(PAC) Johnston v. Carnegie Corp., et. al.

contribution to retirement account, as I had requested in an

employer's form after the account was initially opened.

(**Ex. A B - 17**)


D. Declaratory


E. Unspecified such other relief as the court deems appropriate

subject to damage caps.



Dylan Johnston

3904 South Sequoia Ave.

Broken Arrow, OK 74011

918-845-8667


Signed

Date Aug 8, 2011

Page 41 of 41

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

_DYLAN JOHNSTON_
_____

_____

*(In the space above enter the full name(s) of the plaintiff(s).)*

-against-

_ELLEN BLOOM, CARNEGIE CORPORATION_
_OF NEW YORK, JEANNE D'ONOFRIO,_
_VARTAN GREGORIAN_
*(In the space above enter the full name(s) of the defendant(s).
If you cannot fit the names of all of the defendants in the space
provided, please write "see attached" in the space above and
attach an additional sheet of paper with the full list of names.
Typically, the company or organization named in your charge
to the Equal Employment Opportunity Commission should be
named as a defendant.  Addresses should not be included here.)*

_10  civ 1681_

_AMENDED_
^ **COMPLAINT**
**FOR EMPLOYMENT**
**DISCRIMINATION**

Jury Trial: ⊠ Yes  ☐ No
*(check one)*

This action is brought for discrimination in employment pursuant to: *(check only those that apply)*

_____  Title VII of the Civil Rights Act of 1964, as codified, 42 U.S.C. §§ 2000e
to 2000e-17 (race, color, gender, religion, national origin).
***NOTE:*** *In order to bring suit in federal district court under Title VII, you must first obtain a
Notice of Right to Sue Letter from the Equal Employment Opportunity Commission.*

_____  Age Discrimination in Employment Act of 1967, as codified, 29 U.S.C. §§
621 - 634.
***NOTE:*** *In order to bring suit in federal district court under the Age Discrimination in
Employment Act, you must first file a charge with the Equal Employment Opportunity
Commission.*

⊠  Americans with Disabilities Act of 1990, as codified, 42 U.S.C. §§ 12112 -
12117.
***NOTE:*** *In order to bring suit in federal district court under the Americans with Disabilities Act,
you must first obtain a Notice of Right to Sue Letter from the Equal Employment Opportunity
Commission.*

⊠  New York State Human Rights Law, N.Y. Exec. Law §§ 290 to 297  (age,
race, creed, color, national origin, sexual orientation, military status, sex,
disability, predisposing genetic chacteristics, marital status).

⊠  New York City Human Rights Law, N.Y. City Admin. Code §§ 8-101 to
131 (actual or perceived age, race, creed, color, national origin, gender,
disability, marital status, partnership status, sexual orientation, alienage,
citizenship status).

*Rev. 05/2007*                              1

I.      **Parties in this complaint:**

A.      List your name, address and telephone number.  Do the same for any additional plaintiffs named.  Attach additional sheets of paper as necessary.

Plaintiff        Name   *DYLAN JOHNSTON*
                 Street Address   *3904 S. SEQUOIA AVE*
                 County, City   *TULSA CO., BROKEN ARROW*
                 State & Zip Code   *OKLAHOMA   74011*
                 Telephone Number   *918 - 845 - 8667*

B.      List all defendants' names and the address where each defendant may be served.  Make sure that the defendant(s) listed below are identical to those contained in the above caption.  Attach additional sheets of paper as necessary.

Defendant        Name   *ELLEN BLOOM, CARNEGIE CORPORATION OF NEW YORK, JEANNE DONOFRIO, VARTAN GREGORY*
                 Street Address   *437 MADISON AVE*
                 County, City   *NEW YORK*
                 State & Zip Code   *NEW YORK  10022*
                 Telephone Number   *212 - 371 - 3200*

C.      The address at which I sought employment or was employed by the defendant(s) is:

                 Employer   *CARNEGIE CORPORATION of NEW YORK*
                 Street Address   *437 MADISON AVE*
                 County, City   *NEW YORK*
                 State & Zip Code   *NY  10022*
                 Telephone Number   *212 - 371 - 3200*

II.     **Statement of Claim:**

State as briefly as possible the <u>facts</u> of your case, including relevant dates and events.  Describe how you were discriminated against.  If you are pursuing claims under other federal or state statutes, you should include facts to support those claims.  You may wish to include further details such as the names of other persons involved in the events giving rise to your claims.  Do not cite any cases.  If you intend to allege a number of related claims, number and set forth each claim in a separate paragraph.  Attach additional sheets of paper as necessary.

A. The discriminatory conduct of which I complain in this action includes: *(check only those that apply)*

            __X__          Failure to hire me.

            __X__          Termination of my employment.

            __X__          Failure to promote me.

            _____        Failure to accommodate my disability.

            __X__          Unequal terms and conditions of my employment.

*Rev. 05/2007*                                    2

<u>        X        </u>      Retaliation.

<u>        X        </u>      Other acts *(specify):* <u>DEFAMATION                              </u>.

*Note:*   *Only those grounds raised in the charge filed with the Equal Employment Opportunity Commission can be considered by the federal district court under the federal employment discrimination statutes.*

B.    It is my best recollection that the alleged discriminatory acts occurred on: <u>JAN 2008 - PRESENT</u>
                                                                                 *Date(s)*

C.    I believe that defendant(s) *(check one):*

        <u>     .     </u>        is still committing these acts against me.

        <u>           </u>        is not still committing these acts against me.

D.    Defendant(s) discriminated against me based on my *(check only those that apply and explain)*:

        ☐    race <u>                    </u>        ☐    color <u>              </u>

        ☐    gender/sex <u>          </u>        ☐    religion<u>            </u>

        ☐    national origin <u>                        </u>

        ☐    age.   My date of birth is <u>                    </u> *(Give your date of birth only if you are asserting a claim of age discrimination.)*

        ☒    disability or perceived disability, <u>Mental illness</u> *(specify)*

E.    The facts of my case are as follow *(attach additional sheets as necessary):*

<u>See Attached EEOC COMPLAINT, SUMMARY, APPENDECIES</u>
<u>CORPORATE HANDBOOK</u>
<u>                                                                                    </u>
<u>                                                                                    </u>
<u>                                                                                    </u>
<u>                                                                                    </u>
<u>                                                                                    </u>
<u>                                                                                    </u>
<u>                                                                                    </u>

*Note:*   *As additional support for the facts of your claim, you may attach to this complaint a copy of your charge filed with the Equal Employment Opportunity Commission, the New York State Division of Human Rights or the New York City Commission on Human Rights.*

## III.   **Exhaustion of Federal Administrative Remedies:**

A.    It is my best recollection that I filed a charge with the Equal Employment Opportunity Commission or my Equal Employment Opportunity counselor regarding defendant's alleged discriminatory conduct on: <u>OCTOBER 2, 2009                                        </u> *(Date)*.

*Rev. 05/2007*                                          3

B.   The Equal Employment Opportunity Commission *(check one)*:

_____   has not issued a Notice of Right to Sue letter.

___✕___   issued a Notice of Right to Sue letter, which ~~I received on~~ *was signed* _Nov 10, 2009_ *(Date)*.

*Note: Attach a copy of the Notice of Right to Sue letter from the Equal Employment Opportunity Commission to this complaint.*  ↳ *See exhib H*

C.   Only litigants alleging age discrimination must answer this Question.

Since filing my charge of age discrimination with the Equal Employment Opportunity Commission regarding defendant's alleged discriminatory conduct *(check one)*:

_____   60 days or more have elapsed.

_____   less than 60 days have elapsed.

## IV.   Relief:

WHEREFORE, plaintiff prays that the Court grant such relief as may be appropriate, including injunctive orders, damages, and costs, as follows: _back pay & benefits due to present, unspecified_ _damages_ _____

*(Describe relief sought, including amount of damages, if any, and the basis for such relief.)*

**I declare under penalty of perjury that the foregoing is true and correct.**

Signed this _08_ day of _August_ , 20 _11_ .

Signature of Plaintiff _____

Address   _3904 South Sequoia Ave_
_Briken Arrow, OK_
_7401_

Telephone Number   _918 - 845 - 8667_

Fax Number *(if you have one)* _____

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

_DYLAN JOHNSTON_

_(In the space above enter the full name(s) of the plaintiff(s)/petitioner(s).)_

- against -

_CARNEGIE CORPORATION OF NEW YORK,_
_ELLEN BLOOM, JEANNE D'ONOFRIO,_
_VARTAN GREGORIAN_

_(In the space above enter the full name(s) of the defendant(s)/respondent(s).)_

_10_ Civ. _1681_ (DF) (PAC)

**AFFIRMATION OF SERVICE**

I, _DYLAN JOHNSTON_, declare under penalty of perjury that I have

_(name)_

served a copy of the attached _AMENDED COMPLAINT_

_(document you are serving)_

upon _DEFENDANTS U/A CARA O'SULLIVAN @ KAUFMAN, BORGEEST & RYAN_ whose address is ____

_(name of person served)_

_120 BROADWAY_ , _NEW YORK , NY   10271_

_(where you served document)_

by _Mail_

_(how you served document: For example - personal delivery, mail, overnight express, etc.)_

Dated: _BROKEN ARROW, OK_

_(town/city)_        _(state)_

_August_     _09_ , 20 _11_

_(month)_        _(day)_        _(year)_

Signature

Address _3904 S. Seguoia Ave._

City, State _Broken Arrow, OK_

Zip Code _74011_

Telephone Number _918 - 845 - 8667_

RECEIVED SDNY PRO SE OFFICE
2011 AUG 12   AM 5:50

_Rev. 05/2007_

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

*DYLAN JOHNSTON*

_____

_____

(In the space above enter the full name(s) of the plaintiff(s).)

-against-

*ELLEN BLOOM, CARNEGIE CORPORATION*
*OF NEW YORK, JEANNE D'ONOFRIO,*
*VARTAN GREGORIAN*

(In the space above enter the full name(s) of the defendant(s).
If you cannot fit the names of all of the defendants in the space
provided, please write "see attached" in the space above and
attach an additional sheet of paper with the full list of names.
Typically, the company or organization named in your charge
to the Equal Employment Opportunity Commission should be
named as a defendant.  Addresses should not be included here.)

*10 civ 1681*

*AMENDED*
^ COMPLAINT
FOR EMPLOYMENT
DISCRIMINATION

Jury Trial: ☒ Yes  ☐ No
*(check one)*

This action is brought for discrimination in employment pursuant to: *(check only those that apply)*

_____   Title VII of the Civil Rights Act of 1964, as codified, 42 U.S.C. §§ 2000e
          to 2000e-17 (race, color, gender, religion, national origin).
          *NOTE:  In order to bring suit in federal district court under Title VII, you must first obtain a
          Notice of Right to Sue Letter from the Equal Employment Opportunity Commission.*

_____   Age Discrimination in Employment Act of 1967, as codified, 29 U.S.C. §§
          621 - 634.
          *NOTE:  In order to bring suit in federal district court under the Age Discrimination in
          Employment Act, you must first file a charge with the Equal Employment Opportunity
          Commission.*

☒         Americans with Disabilities Act of 1990, as codified, 42 U.S.C. §§ 12112 -
          12117.
          *NOTE:  In order to bring suit in federal district court under the Americans with Disabilities Act,
          you must first obtain a Notice of Right to Sue Letter from the Equal Employment Opportunity
          Commission.*

☒         New York State Human Rights Law, N.Y. Exec. Law §§ 290 to 297  (age,
          race, creed, color, national origin, sexual orientation, military status, sex,
          disability, predisposing genetic chacteristics, marital status).

☒         New York City Human Rights Law, N.Y. City Admin. Code §§ 8-101 to
          131 (actual or perceived age, race, creed, color, national origin, gender,
          disability, marital status, partnership status, sexual orientation, alienage,
          citizenship status).

*Rev. 05/2007*                                        1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

_DYLAN JOHNSTON_

_____

*(In the space above enter the full name(s) of the plaintiff(s)/petitioner(s).)*

- against -

_CARNEGIE CORPORATION OF NEW YORK_
_ELLEN BLOOM , JEANNE D'ONOFRIO,_
_VARTAN GREGORIAN_

_____

*(In the space above enter the full name(s) of the defendant(s)/respondent(s).)*

10 Civ. _1681_ (DF) (PAC)

**AFFIRMATION OF SERVICE**

I, _DYLAN JOHNSTON_ , **declare under penalty of perjury that I have**
   *(name)*

served a copy of the attached _AMENDED COMPLAINT_
                              *(document you are serving)*

upon _DEFENDANTS Via CARA O'SULLIVAN @ KAUFMAN, BORGEEST & RYAN_  whose address is _____
    *(name of person served)*

_120 BROADWAY , NEW YORK , NY   10271_
                    *(where you served document)*

by _Mail_
   *(how you served document: For example - personal delivery, mail, overnight express, etc.)*

Dated: _BROKEN ARROW, OK_
        *(town/city)*      *(state)*

_August    09_ , 20 _11_
*(month)    (day)    (year)*

RECEIVED
SDNY PRO SE OFFICE
2011 AUG 12   AM 5:58

_____
Signature

_3904 S. Sequoia Ave_
Address

_Broken Arrow, OK_
City, State

_74011_
Zip Code

_918 - 845 - 8667_
Telephone Number

*Rev. 05/2007*

HANDBook

Comment [COMMENT1]: This document needs to be printed with the B font cartridge. Be sure the F cartridge is removed or a strange spacing will appear.

# CARNEGIE CORPORATION OF NEW YORK

# EMPLOYEE HANDBOOK

**437 Madison Avenue**
**New York, New York  10022**

This employee handbook is intended to acquaint new employees with the Corporation's operations and to provide all staff members with the reference forms and procedures.  The handbook will be updated periodically to reflect changes in policies and procedures.

This handbook describes both the benefits provided to the Corporation's staff members and procedures to be followed based on the Corporation's policies and benefit plan documents in effect on the dates indicated on the bottom of each page.  *This handbook does not constitute an employment contract and does not create any rights to be employed.  The policies and plans can be changed, terminated, or otherwise modified at any time.*  You can find out if any change has been made in any policy or plan provision by contacting the human resources office.

## CARNEGIE CORPORATION OF NEW YORK

Andrew Carnegie (pronounced Car-NAY-gie) founded Carnegie Corporation in 1911 for "the advancement and diffusion of knowledge and understanding among the people of the United States...." His gift of $125 million made it the largest philanthropic trust established until that time. He subsequently added $10 million to his gift and gave the Corporation the authority to make grants for the benefit of some countries that are or have been members of the British Commonwealth.

Carnegie gave the Corporation's trustees authority to change policies or causes aided when their judgment deemed it necessary or desirable. In 1971 the board adopted a resolution intended to express the overall goals of trusteeship, which reads, in part, as follows:

> [T]he primary responsibility of the board...is to focus its attention on the effectiveness of the Corporation's program as a whole, from a policy standpoint. While retaining final grant-making authority, the board should play a greater role in setting, reviewing, and revising the broad objectives of the Corporation than in scrutinizing individual proposals for grants. It should be concerned with the distribution of the Corporation's resources among the general areas of philanthropy chosen by the Corporation at any time, and with the question of whether those areas are of critical and continuing importance in society.

Operating through its officers and staff members, the Corporation awarded approximately 273 grants totalling $59.8 million in fiscal year 2000 in these program categories:

Education Division (ED)
International Development (IDP)
International Peace and Security (IPS)
Strengthening U.S. Democracy (SUSD)

In addition to the United States, the Corporation operates in selected countries in Africa that are or were part of the British overseas Commonwealth, the English-speaking countries of the Caribbean, and Mexico.

## THE BOARD OF TRUSTEES

### Membership

Sixteen members are elected for four-year terms, renewable once. The president of the Corporation serves as an *ex-officio* member. There is currently one honorary trustee, Caryl P. Haskins, former trustee and chairman of the board and a past president of the Carnegie Institution of Washington.

The most recent information on trustees can be found in the TRUSTEES database (a Q&A menu selection).  Contact the secretary's office if you have any questions regarding this information.

## Meetings

Quarterly meetings are held in February, April, June, and October, most often on the second Thursday of the month.  The February meeting is the annual meeting of the Corporation, at which elections take place.  On occasion, an extended meeting or retreat may be held in the spring or summer.  The October meeting is the first meeting of the fiscal year, which is from October 1 to September 30, and the Corporation's program and administrative budgets are reviewed and approved at that time.

## Committees

The standing committees of the board are the planning and finance committee, the investment committee, and the committee on trustees.

The planning and finance committee is responsible for overseeing operational planning, budgeting, and control for the Corporation.  It recommends the annual budget to the board.

The investment management committee is responsible for guiding and overseeing investment of the Corporation's endowment to provide maximum yield consistent with prudent preservation and target growth of its assets.

The committee on trustees has primary responsibility for the overall quality, vitality, and effectiveness of the Corporation=s board of trustees.

In addition to the standing committees, the full board of trustees comprises the program committee.  It is responsible for providing leadership and direction in shaping the Corporation=s programs to achieve the Corporation=s overall mission and objectives. It is currently working in subcommittees organized around each major program area.

The secretary's office arranges all board meetings, for which the Corporation's secretary serves as recording secretary.

**OTHER CARNEGIE ORGANIZATIONS**

Andrew Carnegie founded a number of organizations and institutions in the United States and the United Kingdom bearing his name. The pamphlet, *The Carnegie Trusts and Institutions*, enclosed in the pocket following this chapter, provides a useful orientation to them. The Corporation is most frequently confused with The Carnegie Foundation for the Advancement of Teaching, which is an operating, not a grant-making, foundation. The foundation, based in Menlo Park, California, is headed by president Lee Shulman, and its main activity is policy studies in American education.

See appendix 1 for the names and locations of these trusts and institutions in the United States and Europe.

**Appendix:**    1. Other Carnegie Trusts and Institutions

## OTHER CARNEGIE TRUSTS AND INSTITUTIONS

| | |
|---|---|
| **Carnegie Institute** | 4400 Forbes Avenue<br>Pittsburgh, Pennsylvania  15213-4080<br>(412) 622-3131 |
| **Carnegie Mellon University** | 5000 Forbes Avenue<br>Pittsburgh, Pennsylvania  15213<br>(412) 268-2000 |
| **The Carnegie Trust for<br>the Universities of<br>Scotland** | Cameron House<br>Abbey Park Place<br>Dunfermline, Fife<br>Scotland KY12 7PZ |
| **Carnegie Institution<br>of Washington** | 1530 P Street, N.W.<br>Washington, D.C.  20005<br>(202) 387-6400 |
| **The Carnegie<br>Dunfermline Trust** | Abbey Park House<br>Abbey Park Place<br>Dunfermline, Fife<br>Scotland KY12 7PB |
| **Carnegie Hero Fund<br>Commission** | 425 Sixth Avenue<br>Suite 1640<br>Pittsburgh, Pennsylvania 15219<br>(800) 447-8900;  (412) 281-1302 |
| **The Carnegie Hero<br>Fund Trust** | Abbey Park House<br>Abbey Park Place<br>Dunfermline, Fife<br>Scotland KY12 7PB |
| **The Carnegie Foundation<br>for the Advancement of<br>Teaching** | 555 Middlefield Road<br>Menlo Park, CA 94025<br>(650) 566-5100 |
| **Carnegie Endowment for<br>International Peace** | 1779 Massachusetts Avenue, N.W.<br>Washington, D.C.  20036-2103<br>(202) 483-7600 |
| **The Carnegie United<br>Kingdom Trust** | Comely Park House<br>Dunfermline, Fife<br>Scotland KY12 7EJ |

November 2001                            IX5                            Introduction

Case 1:10-cv-01681-PAC -DCF   Document 34   Filed 08/12/11   Page 56 of 80

**PERSONNEL POLICIES**  EXHIBIT 2

## EQUAL EMPLOYMENT OPPORTUNITY

Applicants for employment and all staff members throughout their careers at the Corporation are provided with equal opportunity beginning with recruitment and hiring through training and development, compensation, transfer, promotion, and all other conditions of employment without regard to race, color, religion, sex, sexual preference, marital status, age, national origin, or disability.

The Corporation does not condone and will not tolerate any form of discrimination, sexual harassment, or other abusive conduct or treatment based on race, color, religion, sex, sexual preference, marital status, age, national origin, or disability. As it has not been defined before, it should be noted that unwelcome sexual advances, requests for sexual favors, or other verbal or physical conduct of a sexual nature constitutes sexual harassment. Sexual harassment also includes conduct that unreasonably interferes with an individual's work performance or creates an intimidating, offensive, or hostile work environment.

Any staff member who believes that a violation of any aspect of this policy has occurred should bring the violation to the attention of the director of human resources. She and the vice president and chief administrative officer and corporate secretary will ensure that the Corporation investigates the complaint and takes appropriate steps to remedy any violation found to have occurred.

No employee will be retaliated against for complaining of harassment and confidentiality will be maintained to the extent possible.

## EMPLOYEES' LEVELS OF RESPONSIBILITY

Since certain personnel policies and benefit plans differ in relationship to employees' levels of responsibility and/or length of service, the following definitions are used in this handbook:

| | |
|---|---|
| **Executive Staff** (not eligible for overtime)(exempt) | corporate officers, director of finance, director of human resources, director of information systems, director of public affairs and publications, program chairs, program officers, senior investment associate and senior program officers |
| **Middle-Management Staff** (not eligible for overtime)(exempt) | assistant editor, assistant to the president, controller, coordinator for dissemination and media programs, coordinator of investment performance, database administrator/systems analyst, grants manager, human resources associate, librarian, office manager, program assistants and associates, public affairs associate, records manager, senior financial analyst and writer |
| **Middle-Management Staff) (eligible for overtime )(non-exempt) | accountant, accounts payable coordinator, administrative assistants, assistant to the president for special projects, executive assistants and information systems support specialist |

| | |
|---|---|
| **Support Staff**<br>(eligible for overtime)<br>(non-exempt) | accounting/project assistant, mail/supply clerk,<br>mail clerk/office assistant, receptionist/switchboard operator,<br>staff assistant, and systems technician |
| **Regular Employees** | Full-time employees are regularly scheduled to work 35 hours a week. As salaried employees, on the regular payroll, all full-time employees are eligible to participate in Carnegie Corporation's benefits program. |
| **Part-time Employees** | Part-time employees are classified by the number of hours they are regularly scheduled to work in a week:<br><br>You are a *part-time salaried employee* if you are regularly scheduled to work at least 21 hours a week but less than the full-time workweek of 35 hours. You are paid a fixed salary and are eligible to participate in Carnegie Corporation's benefits program with the *exception* of the group life insurance and tuition reimbursement plans. Vacation and personal days as well as holidays, are prorated in accordance with the number of days worked each week. For example, an individual who works three days a week is entitled to fifteen vacation/personal days after one year of service (3/5 of 25).<br><br>You are a *part-time hourly-paid employee* if you are regularly scheduled to work less than 21 hours a week. You are paid on an hourly basis and are generally not eligible for Carnegie Corporation benefits or paid time off.<br><br>Part-time employees who work overtime are paid at their regular rate up to forty hours. Those who are eligible for overtime compensation are paid on a time-and-a-half basis after forty hours of work in any given week. |
| **Other employees** | Carnegie Corporation sometimes hires full-time and part-time employees who are on its payroll for a specific length of time or for a temporary project. In general, these employees are not eligible to participate in the Corporation's benefits program. |

**NEW EMPLOYEES**

**Probationary Period**

A new member of the support staff and administrative and executive assistants serve a probationary period of not less than three months. At the end of this period, his performance is reviewed by his supervisor. If his performance is satisfactory and the employee wishes to remain, the employee is then placed on the regular payroll and enrolled in additional benefits as appropriate.

**Benefits**

During the probationary period, a new employee is covered under the health, dental and vision plans. (See Employee Benefits.)

**Relocation Expenses**

The Corporation will reimburse newly appointed executive and middle-management staff members for costs of travel and shipment of personal effects resulting from the relocation of their residence. Some of this reimbursement may be taxable income. The Corporation will reimburse staff members for federal, state, city, and FICA taxes resulting from additional income due to reimbursement of move costs. The reimbursement of taxes represents taxable income to staff members in the year received, and staff members will be responsible for any related income taxes on this amount.

Staff members must supply the Corporation with copies of the applicable tax returns and other documentation related to calculations, etc., to support the reimbursement requested. The director of finance should be consulted in advance of a move for information about amounts considered taxable.

In some situations, the Corporation will pay the cost for temporary housing in an economy hotel for up to thirty days while the staff member seeks permanent housing. A small daily allowance for meals ($25.00) is provided as well.

## EMPLOYMENT OF RELATIVES

Over the years, a number of staff members have referred their relatives for employment at the Corporation. Carnegie Corporation will consider such referrals; however, employment of members of the immediate family within the same unit is not permitted. This policy relates to consultants as well.

## SALARY STRUCTURE AND REVIEW

The salary of each employee is reviewed annually. The amount of money for salary adjustments in each year's budget is based on the level of the total budget, trends in the New York City labor market, and the comparison of Corporation pay scales to those of other nonprofit organizations, and profit-making organizations, where appropriate.

Increases are based on merit, revised or additional responsibilities, and skills. They are effective at the beginning of the Corporation's fiscal year, which is October 1, subject to the approval of the planning and finance committee.

Salary adjustments are recommended by the personnel review committee based on the performance ranking received by each staff member from his or her supervisor. They require the approval of the president before presentation to, and approval by, the planning and finance committee. Corporate officers' salaries are approved by the board of trustees.

## PERFORMANCE REVIEW

The performance of new staff members at the support level as well as administrative and executive assistants is reviewed at the end of their first three months of employment.  The supervisor sends a memorandum to the Human Resources Office outlining the staff member's performance.  Each supervisor will be reminded to do this by the HR staff as appropriate.  The memorandum is placed in the staff member's personnel file.

Thereafter, performance reviews are conducted for most staff members annually--usually in July or August.  Your performance evaluation is an opportunity for you and your supervisor to meet to review your performance and prepare work plans for the next evaluation period.  However, staff members are encouraged to have an ongoing dialogue with their supervisior about performance, work plans, and any other issues.  A mid-year review is held for each staff member during the month of March.

Performance evaluations are based on guidelines developed by senior management and the Personnel Review Committee.  Information about the performance review process is circulated to all staff members each year--usually in the summer.  These details will be placed on the Intranet some time in 2002.  However, the information may be secured from the human resources office as well.

## PAYDAYS

Paydays are on the fourteenth and twenty-eighth of each month.  When these dates are not business days, payment will be made on the first preceding business day.  The first payment covers wages earned through the fifteenth of the month; the second, wages payable through the end of the month.  All staff members have the option of being paid once a month, on the fourteenth.  Payment is made by check or direct credit to an individual's account at the bank designated by the staff member.  Timely submission of payroll changes is important.  (See Appendix l, "Payroll Schedule," for appropriate dates.)

Deductions are made from all salary checks for federal, state, and local income taxes including social security.  Since the amount withheld depends upon the staff member's place of residence and the number of exemptions claimed, the finance office should be notified when any of these factors changes.

## WORK AFTER OFFICE HOURS

**Exempt** employees are those in positions designated by Carnegie Corporation as exempt from the overtime requirements of the Fair Labor Standards Act.  **Non-exempt** employees are those in positions designated by the Corporation as not exempt from the overtime requirements of the Fair Labor Standards Act (see Employees Levels of Responsibility, page III—1).  All staff members, however, are eligible to claim reimbursement for meals and car services after hours.

## Overtime Compensation

While it is not usually encouraged, the Corporation realizes that there will be occasions

when it is necessary for a staff member to work overtime. We appreciate the time staff members put in, and request that you submit claims for overtime when necessary. Therefore, compensation for work performed beyond the  normal work week of thirty five hours will be paid to non-exempt employees upon submission of the "Overtime Authorization" form (appendix 2). Compensation is based on salary in effect when overtime is earned.

Overtime is paid with the normal payroll. The payroll is ordinarily prepared five working days before payment date; all "Overtime Authorization" forms must be submitted to the director of human resources for approval in time to permit forwarding to the finance office. (The finance office circulates a schedule of payroll deadline dates.)

Overtime is paid for work performed between thirty-five and forty hours a week on a straight time basis. For work over forty hours, pay is on a time-and-a-half basis. The rate per hour for overtime work beyond forty hours is calculated by dividing the semimonthly rate by 75.83 hours, which in turn is multiplied by 1.5.

In order to determine whether extra hours are to be paid at the straight rate or the time-and-a-half rate, overtime forms should include only one week per page. Only overtime forms for completed weeks should be submitted. If a week is not completed at the time of the payroll deadline date, overtime for that week should not be submitted until the following payroll date.

Exempt staff members do not have specified working hours beyond the official Corporation hours, but are expected to work more than thirty-five hours per week whenever necessary.

**Procedure for approval**

Non-exempt employees should not work overtime without approval from their supervisor. *All overtime work must be approved in advance.*

Once a supervisor of a program/administrative unit determines that there is a need for a non-exempt employee to work overtime, the supervisor should request approval, *in writing*, also *in advance*, from either the vice president and director for strategic planning and program coordination or the vice president and chief administrative officer and corporate secretary, depending on whether the request is from the program or administrative side of the Corporation. The vice president of public affairs and the vice president and chief investment officer will approve overtime for their respective areas.

Since we recognize that unusual situations do arise, a supervisor will have discretion to approve *up to five hours* overtime during any given week to respond to time-sensitive projects that must be completed. However, this should not be interpreted to mean that the routine approval of five hours overtime each week is acceptable. *Remember, under normal conditions, approval will not be given for overtime after the work has been performed.*

**Meals**

When overtime begins at 5:00 p.m. on a weekday and extends beyond 7:00 p.m., dinner expenses of up to $20 will be reimbursed. On weekends and holidays, luncheon expenses of up to $10 will be reimbursed for those who work four hours or more and up to $20 for work extending beyond 7 p.m. When the "Overtime Authorization" form is submitted to the director of human

resources, an application for luncheon or dinner allowance, if appropriate, should be submitted on the "Claim for Incidental Local Expenses and Local Entertainment of Carnegie Corporation Guests" form. The form should be approved by someone in the human resources office and given to the accounts payable coordinator by 11:00 on Monday mornings. Staff members will be paid for these expenses each Tuesday between 11:30 a.m. and 12:30 p.m. Requests for reimbursement for meals should be made on a weekly basis and **should be accompanied by a receipt**.

## Car Service

The Corporation permits any staff member who begins work at 9:00 a.m. and works overtime beyond 8:00 p.m. to take a car service home if it is unsafe for the staff member to use other available means of transportation. It is recommended that staff members use either **Empire Executive Car, Charge and Ride, Inc, or Intaboro**. Vouchers may be obtained from the human resources office or the office manager. Tipping is not necessary.

## AUTHORSHIP AGREEMENT

The Corporation requires corporate officers, program staff members, administrative officers, as well as select administrative staff members, to sign an "Authorship Agreement" at the time of employment. It is kept in the staff member's personnel folder. The content of the agreement follows:

In consideration of my employment by Carnegie Corporation of New York or any of its commissions, task forces, or other operating programs ("the Corporation"), and my continued employment during such time as the Corporation and I agree, the Corporation and I agree that:

A. The scope of my employment with the Corporation includes the creation and authorship of works of research and scholarship relating to the dissemination of knowledge, the promotion of peace and education and the Corporation's other purposes, and related areas (collectively, the "Works").

B. The Works are subject to the Corporation's internal review and editing process, as to both form and content.

C. The Works are (and Works created in the future will be) deemed to be "works made for hire" within the meaning of the U.S. Copyright Act. Accordingly, the Corporation is (and will be) considered to be the author of the Works and the sole owner throughout the world of the Works and of all copyrights and other rights in the Works (the "Rights").

D. I understand that, under any applicable law, a Work may not be deemed to be a "work made for hire" for the Corporation, or the Corporation may not be deemed to be the author of such Work and the sole owner of such Work and all Rights in such Work(s). I hereby assign to the Corporation throughout the world in perpetuity all of my Rights in each such Work, and in any other work created by me during the period of my employment with the Corporation either during working hours or with the use of the Corporation's materials or facilities.

E. I will, without charge to the Corporation but at its expense, execute an assignment of title to the Corporation and do anything else reasonably necessary to enable the Corporation to

secure a copyright or other form of protection for any work assigned above anywhere in the world.

F. The Corporation may, at its sole option, assign or re-assign the Works, and all Rights in any of the Works, to the undersigned employee, on terms and conditions determined by the Corporation.

G. In connection with any agreement between the Corporation and any publisher (the "Publisher") with respect to the publication by such publisher of any Work, I hereby grant to the Corporation the right to grant to the Publisher (and its assignees and designees) the right to use my name, portrait, likeness and biography in connection with the exploitation of such Work and the rights granted to the Publisher by the Corporation.

H. In the event that a staff member is considering authoring a Work that could be considered to be a Work but that the staff members feels should, for a specified reason or because of a particular circumstance, not be a Work and consequently not be covered by this Agreement, the staff member must discuss the matter with the President of the Corporation before undertaking such Work or signing contracts or agreements relating to the Work. This discussion will also cover the terms of the staff member's copyright in such Work and any fees or other remuneration that might be involved

I. This agreement (1) is not a contract of employment, (2) shall be governed by the laws in effect in the state of New York, and (3) shall be binding upon and inure to the benefit of the Corporation and the undersigned employee and their respective successors.

_____
Employee's signature

_____
Employee's Name (Print)

_____
Date

Accepted and Agreed as of the above date:

CARNEGIE CORPORATION OF NEW YORK

By:_____

## HOLIDAYS

The Corporation has eleven holidays. A schedule of holidays is prepared by the director of human resources in August for circulation to staff members and varies somewhat from year to year. The president must approve the schedule. Generally, the eleven holidays are the following:

| | |
|---|---|
| Columbus Day | Martin Luther King, Jr.'s Birthday |
| Thanksgiving Day | Presidents' Day |
| Thanksgiving Friday | Memorial Day |
| Christmas Eve | Independence Day |
| Christmas Day | Labor Day |
| New Year's Day | |

The Corporation closes on Election Day during a presidential election year. In other years, under New York State, law employees are allowed two hours of free time to vote, if needed.

Staff members also receive **two personal days** a year, which may be taken at any time for personal matters. These should be approved in writing with the staff member's supervisor and a memo forwarded to CCschedules via e-mail. Time off should be scheduled in advance of the day to be taken.

## VACATION

In March of each year, a memorandum is circulated by the receptionist to staff members in grades one (1) through and including eight (8) asking each employee to indicate when he wants to take vacation. Schedules are then prepared. All vacation leave must be cleared with the person to whom the staff member reports, in advance, so that adequate office, telephone, and correspondence coverage may be arranged. Contact the Human Resources office if you need **temporary help** but only after securing approval from the vice president and director for strategic planning and program coordination or the vice president and chief administrative officer and corporate secretary, depending on whether the request is from the program or administrative side of the Corporation. The vice president of public affairs and the vice president and chief investment officer will approve these requests for their respective areas.

Each employee is entitled to twenty-three vacation days each year, accruing at the rate of almost two days per month. Staff members who begin work on or before the fifteenth of the month receive vacation credit for the entire month as do those whose employment terminates on or after the sixteenth of the month. It is preferred that vacation be taken in consecutive days and at a time most convenient for the work of the unit. However, up to eight vacation days from the previous fiscal year may be carried forward to the next fiscal year, but must be taken by September 30 of that fiscal year or they will be forfeited.

Staff members in grades one (1) through and including (8) have the option of converting up to eight days each fiscal year into pay in lieu of time off. In other words, staff members will be paid for a maximum of eight days only each fiscal year, regardless of when the days were earned. Requests for **payment in lieu of vacation** are submitted to the receptionist via CCschedules, who then forwards them to the vice president/chief administrative officer and corporate secretary for approval. These payments are part of the payroll and are subject to the requirements for timely submission; all applicable deductions are made. Payment is based on the salary in effect during the period the vacation is earned.

If a staff member takes half of a vacation day, 1:30 p.m. is considered to be the appropriate time to arrive if the time off is in the morning, and 12:30 p.m. is the time to leave if the time off is in the afternoon. This is based on the fact that the Corporation's official work week is thirty-five

hours.

Except under unusual circumstances, vacation days may not be taken until the employee has been placed on the regular payroll.

## Vacation Advances

Vacation advances are made upon written request to the finance office. These are for pay which would normally be distributed while the employee is on vacation. Any other advances will be made only in very unusual situations, and requests for these must be submitted to the director of human resources. These requests are handled on the regular paydays and are subject to timely submission. (See Appendix l, "Payroll Schedule.")

Vacation does not accrue during a leave of absence with or without pay.

## LEAVES OF ABSENCE

### Sick Days

The Corporation does not allow a specific number of days for sick leave. Full salary will be continued for up to six months under most circumstances for regular employees.

The Corporation is subject to the New York State Disability law. After eight consecutive days of illness, employees must file for benefits and will receive from the state half of their weekly salary up to $170 for a period of twenty-six weeks. For periods during which the Corporation is continuing full salary, these state payments must be turned over to the Corporation.

If a regular staff member becomes incapable of working for six months, long-term disability insurance with Teachers Insurance and Annuity Association and Paul Revere Insurance Company, where applicable, would be applied.

### Jury Duty

Staff members are encouraged to accept their civic responsibility to serve on juries when called. Salary and other benefits will not be interrupted during this period, but employees are expected to come to work when excused from the jury at a reasonable hour. Staff members may keep jury pay.

A staff member should request leave from the person to whom he reports and the director of human resources indicating the date service is to begin.

If the supervisor determines that the absence would cause great inconvenience because of expected work load, the staff member will be asked to seek a postponement of jury duty.

### Illness in the Immediate Family

Personal excused absence with pay is provided for up to ten days each fiscal year when there is an illness in the immediate family. Immediate family includes child, spouse, domestic partner, parent, grandparent, brother or sister of staff member or of spouse, and other relatives living in

staff member's household.

## Family and Medical Leave Act of 1993

The Corporation complies with the Family and Medical Leave Act (FMLA) of 1993. This legislation requires that an employer with fifty or more employees permits eligible workers to take unpaid leave of up to twelve weeks in any twelve-month period, in connection with the birth, adoption or foster placement of a child, or the serious health condition of the employee or the employee's spouse, child, or parent.

To be eligible, an employee must be employed by his current employer for at least twelve months and must have completed at least 1,250 hours of service during the previous twelve months.

The FMLA provides that the employer must continue the employee's group health insurance coverage during the period of leave of absence.

The FMLA also provides that an employee is entitled, on return from leave, to be restored to the same or equivalent position of employment held by the employee when the leave commenced.

A staff member is able to utilize the Corporation's paid leave for illness in the immediate family, as outlined above, before taking unpaid leave under the FMLA.

## Leave for Death in the Family

Up to five days of leave with pay will be granted in addition to vacation and personal holidays for the death of an immediate family member. Immediate family includes child, spouse, domestic partner, parent, grandparent, brother or sister of staff member or of spouse, and other relatives living in staff member's household. Staff members must use vacation or personal days in all other situations.

## Parental Leave

Staff members who become parents have special needs in connection with establishing a relationship with the child and making the necessary adjustments to changes in family life.

An employee who works a minimum of twenty-one hours a week is eligible for leave after six months of service for the birth or adoption of a child.

## Maternity Leave

The employee may work for as long as she is able to do so. Maternity leave may be continued for up to six months from the date of birth or adoption of a child.

An employee will receive full salary for the first **eight** weeks of maternity leave. The balance of the leave is **without** pay. The eight weeks' salary is in addition to the employee's regular paid vacation accrued up to the time of departure. Vacation benefits do not accrue during paid or unpaid maternity leave.

If the employee decides to return to work prior to completion of the paid portion of maternity leave, she would forfeit the balance of the benefit.

All benefits will remain in full force and effect with the following exception:

> The Corporation's contribution to the employee's retirement fund will cease when **unpaid** maternity leave begins.

If serious medical complications arise in connection with pregnancy, policies related to sick leave, health, hospital, and long-term disability insurance will provide assistance to the staff member. When a staff member is utilizing leave for medical complications, she will not be eligible for duplicate coverage under the maternity leave policy.

It is the intention of the Corporation to offer an employee who takes maternity leave a comparable position, but not necessarily the same position, at not less than the salary at the time of departure, upon return to work. As with all of the Corporation's other policies, this policy is subject to change at any time and is not an employment contract or other guarantee of employment.

**Paternity Leave**

Paternity leave may be continued for up to six months from the date of birth or adoption of a child.

Full salary will be continued for the first **eight** weeks of paternity leave. The balance of the leave is **without** pay. The eight weeks' salary is in addition to the employee's regular paid vacation accrued up to the time of departure. Vacation benefits do not accrue during paid or unpaid paternity leave.

If the employee decides to return to work prior to completion of the paid portion of paternity leave, he would forfeit the balance of the benefit.

All benefits will remain in full force and effect with the following exception:

The Corporation's contribution to the employee's retirement fund will cease when **unpaid** paternity leave begins.

It is the intention of the Corporation to offer an employee who takes paternity leave a comparable position, but not necessarily the same position, at not less than the salary at the time of departure, upon return to work. As with all of the Corporation's other policies, this policy is subject to change at any time and is not an employment contract or other guarantee of employment.

**TRANSFERS AND PROMOTIONS**

When a position becomes available or a new position is created, the position will be advertised both inside and outside the Corporation. Qualified staff members may apply for new assignments and will be considered together with other candidates. Applicants will be reviewed

consistent with the Equal Employment Opportunity policy of the Corporation. Current staff members will be given preference for promotional opportunities.

The salary for the position will be based on the salary range for the position and the relevant experience of the applicant. New hires and promotions will require the written approval of the president.

A "promotion-in-place", e.g. an administrative assistant taking on additional responsibilities comparable to an executive assistant position, will not follow the above stated process. However, the personnel review committee will also review proposed promotions and make recommendations to the president.

There will be a three-month probationary period for all transfers from one area to another. A staff member must be in his/her current position for at least six months before he/she may apply for another position at the Corporation.

## TERMINATION OF EMPLOYMENT

Separation of employment from the Corporation may be initiated by the staff member or by the Corporation, or may be effected when the staff member is disqualified from further employment by personal circumstances not connected with work at the Corporation.

### Resignation

A staff member who resigns will be paid regular salary through the last day of work. Vacation accumulated to date will also be paid. Staff members who resign on their own initiative are expected to give notice as follows:

**Executive and middle-management staff**—At least one month advance notice in writing to the president, vice president and chief administrative officer, director of human resources, and immediate supervisor.

**Support staff**—Two weeks' advance notice in writing to the immediate supervisor and the director of human resources.

### Termination by the Corporation

Corporation-initiated separations include dismissal, in which the Corporation acts to terminate an employee for unsatisfactory performance or misconduct, and situations in which the Corporation, through no fault of the staff member, eliminates the job assignment or has a reduction in force and is unable to provide another suitable position. While normally employees are not dismissed for any other reasons, the Corporation retains the right in other circumstances to terminate any employee.

#### Dismissal

Unsatisfactory performance includes, but is not limited to, habitual absenteeism or tardiness, inadequate work performance, dishonest or illegal acts, and lack of propriety or judgment. Salary will be paid through the last day of work. Vacation accumulated to date will also be paid.

**For executive and middle-management staff**

Dismissal due to unsatisfactory performance by executive and middle-management staff will be authorized by the president on the recommendation of the vice president and chief administrative officer and corporate secretary and/or the program chair or administrative officer.

## For support staff

When an immediate supervisor determines that a support staff member's performance is sufficiently unsatisfactory to warrant consideration of dismissal, the supervisor will meet with the individual and specifically describe the unsatisfactory performance. During this meeting a probationary period of one month may be established if it appears that the deficiencies may be corrected.

The supervisor will notify the director of human resources by memorandum when a staff member has been warned for unsatisfactory performance. The memorandum will describe the individual's deficiencies and will contain the dates of any probationary period. A copy of the memorandum will be given to the staff member.

The director of human resources will remind the supervisor when the probationary period is over. In consultation with the director, the supervisor will determine whether the staff member's performance during the probationary period warrants dismissal or continuation of employment. The supervisor will inform the staff member orally and in writing of the determination made following the probationary period. A copy of the written determination will be sent to the human resources department.

A warning or probationary period will not be given in cases of recurring unsatisfactory performance for which a written warning and probationary period have been given before. Immediate dismissal can occur when the support staff member's conduct makes it apparent that the individual cannot be trusted to work effectively for the Corporation or in any other circumstances where the supervisor and the human resources director determine that a probationary period is inappropriate.

Support staff members whose performance is unsatisfactory during the initial three-month probationary period will not be retained by the Corporation.

## Position Elimination

If reorganization results in the elimination of the position to which a staff member is assigned and if suitable alternative work cannot be offered by the Corporation, the staff member will receive as much advance notice as possible, but not less than one month. The staff member will be eligible for a severance allowance as set forth in the discretionary severance plan which follows:

SUMMARY PLAN DESCRIPTION
FOR THE DISCRETIONARY SEVERANCE PAY PLAN

This is a summary of the Discretionary Severance Pay Plan of Carnegie Corporation of New York ("the Plan"), which does not attempt to cover all the details which may be found in the Plan document. Since the Plan document legally governs any discrepancy between its terms and this summary, the language of the Plan document will always be controlling.

Description of Discretionary Severance Pay Plan

If you are a regular full-time or part-time employee of Carnegie Corporation of New York (the "Corporation") you will be covered by the Plan once you complete your probationary period, if any. For more information regarding what constitutes regular full-time or part-time employment and probationary periods, please see the "Personnel Policies" section of the Corporation's employee handbook.

The Corporation does not provide as a matter of right severance pay to regular employees who are terminated or voluntarily resign. Generally, whether or not severance pay, if any, is paid in each individual circumstance is a matter solely within the discretion of the Personnel Review Committee designated by the Board of Trustees of the Corporation.

The Plan does provide that if a regular employee's employment with the Corporation is involuntarily terminated due to a job elimination, reduction in force, or corporate downsizing (a "Position Elimination"), such employee may receive severance pay, but only if such employee signs a release provided by the Committee and is not offered other work by the Corporation. An employee who terminates employment for any other reason may not be treated as having incurred a Position Elimination. For example, an employee who resigns, retires, dies, or is discharged for cause or disability may not be treated as having incurred a Position Elimination.

The amount paid to a regular employee who incurs a Position Elimination will be based on the length of such employee's most recent period of continuous service: two weeks' salary for each year of service; for any remaining partial year of service, two weeks' salary shall be multiplied by a fraction, the numerator of which is the employee's days of service and the denominator of which is 365. The minimum severance payment is two weeks' salary and the maximum severance payment is fifty-two weeks' salary.

The award of any other severance payments under the Plan, including, but not limited to, additional severance payments to a regular employee who incurs a Position Elimination or payments to a regular employee who terminates employment with the Corporation under other circumstances, shall be a matter solely within the discretion of the Personnel Review Committee and, to the extent applicable, the Board of Trustees; provided, however, that employees who die or are discharged for cause are not entitled to receive any severance pay under the Plan under any circumstances.

Plan Continuation

The Corporation intends to continue the Discretionary Severance Pay Plan indefinitely, but reserves the right to amend, modify, reduce the benefits under, or terminate the Plan at any time. Participation in the Plan does not confer any rights for your continued employment with the Corporation nor can any assignment, pledge, or other transfer be made by any employee of any interest in or payment under the Plan.

## Claims Procedure

An employee who submits to the Director of Human Resources, Carnegie Corporation of New York, 437 Madison Avenue, New York, New York 10022, a written claim for benefits that is denied (wholly or partially) must be notified in writing within 90 days (180 days under special circumstances) of receipt of the written claim, of the reason for the denial, the pertinent Plan provision upon which the denial is based, any additional information which may be needed and the reason such additional information (if any) is needed, and the steps that may be taken to obtain further review of the claim. A claim will be deemed to have been denied if the claimant does not receive a written notification within the applicable 90 (or 180) day period.

Any claimant who wishes to have a claim which is denied or deemed denied further reviewed must send a written request for review to the Personnel Review Committee, c/o, Director of Human Resources, Carnegie Corporation of New York, 437 Madison Avenue, New York, New York 10022, within 60 days after the initial claim is denied, or deemed to have been denied. The claimant, or his or her representative, will be permitted to review pertinent documents and may also submit a written statement of the reason(s) for the request for review, along with documents or records in support of the request for review.

If the claim is denied on further review, a written notice of the denial with the same information described above, as appropriate, will be given to the claimant within 60 days (120 days under special circumstances) after receipt of the written request for review. If no decision is furnished within this 60 (or 120) day period, the claim will be considered as having been denied on review.

## Statement of ERISA Rights

The Discretionary Severance Pay Plan is subject to the provisions of the Employee Retirement Income Security Act of 1974, as amended ("ERISA"). ERISA provides participants with certain rights and protections as described below:

Participants may examine, without charge, the Plan document at the plan administrator's office; and

Participants may obtain copies of the Plan document, upon written request to the plan administrator, who may make a reasonable charge for the copies.

In addition to creating rights for plan participants, ERISA imposes duties upon the people who are responsible for the operation of the employee benefit plan:

The people who operate your plan, called "fiduciaries" of the plan, have a duty to do so prudently and in the interest of you and other plan participants. No one, including your employer or any other person, may fire you or otherwise discriminate against you in any way to prevent you from obtaining a welfare benefit or exercising your rights under ERISA. If your claim for a welfare benefit is denied in whole or in part you must receive a written explanation of the reasons for the denial. You have the right to have the plan administrator review and reconsider your claim.

Under ERISA, there are steps you can take to enforce the above rights. For instance if you

---

request materials from the plan administrator and do not receive them within 30 days, you may file suit in a federal court. In such a case, the court may require the plan administrator to provide the materials and pay you up to $100 a day until you receive the material, unless the materials were not sent because of reasons beyond the control of the plan administrator. If you have a claim for benefits which is denied or ignored, in whole or in part, you may file suit in a state or federal court. If it should happen that you are discriminated against for asserting your rights, you may seek assistance from the U.S. Department of Labor, or you may file suit in a federal court.

The court will decide who should pay court costs and legal fees. If you are successful, the court may order the person you have sued to pay these costs and fees. If you lose, the court may order you to pay these costs and fees.

If you have any questions about your plan, you should contact the Director of Human Resources. If you have any questions about this statement or about your rights under ERISA, you should contact the nearest Area Office of the U.S. Labor-Management Services Administration, Department of Labor.

**Corporation Benefits**

Corporation-paid benefits will continue through the end of the month in which employment ends. These benefits will not be extended for periods covered by severance pay. However, a staff member may request that he/she be continued on the Corporation's group health plans as outlined under the Consolidated Omnibus Budget Reconciliation Act of 1985 (COBRA) for up to eighteen months beyond the end of the month in which employment ends at the staff member's expense.

COBRA's aim is to make affordable medical plan coverage available to persons who lose the opportunity to participate in employer-sponsored group plans. In general, an employer must offer employees, their spouses, and their dependents the chance to buy health-care coverage at group rates, if they cease to qualify for coverage under the employer's group plan. The premiums must be sent to the human resources office at the beginning of each month by the departing staff member.

**CHANGE OF ADDRESS**

A staff member should inform the **human resources office and the finance office** in writing of any change in home address, telephone number, or marital status. This is important for the accuracy of the personnel records, benefits administration, payroll processing, and emergencies.

**OFFICE ATTIRE**

Staff members are expected at all times to present a professional, business-like image to grantees, other staff members and the public. Extreme fashions should be avoided. Jackets and ties for men or suits, pants and blouses, dresses or jackets and skirts for women would be considered appropriate. Inappropriate items of dress would include blue jeans (and their near relatives), leather pants, T-shirts, sundresses, bare-back or low-cut blouses, mini skirts, fitted stretch pants or other tightly-fitted clothing, leggings, shorts, capri pants, and sneakers.

During the months of July and August, our offices close at 1:00 p.m. each Friday. Casual attire is permitted every Friday during these months if the staff member does not have a business meeting with individuals from another organization. However, casual attire should reflect our professionalism and should not be distracting or disruptive. Casual pants (Khakis or Chinos) and shirts for men, or casual dresses, pants or skirts and blouses for women would be considered appropriate. Jeans, torn clothes, sweat suits, T-shirts, shorts, tank tops, halters, tube tops, sundresses, capri pants, and sneakers are examples of inappropriate casual clothing.

## SABBATICAL

The Corporation sometimes grants paid leave to an employee for the purpose of engaging in a specific project related directly to the Corporation's grants program, its broader interests, or its role in American life. A project related to a private, personal interest (e.g., a study of bonsai growing) would not qualify.

Sabbaticals are investments by the Corporation in staff members, on the expectation of increased effectiveness by those receiving them. Although minimum length of service is a prerequisite for a sabbatical, length of service does not entitle a staff member to such paid leave. A sabbatical is not a reward for long service.

### Eligibility

Executive and middle-management staff members are eligible for sabbaticals. Preference is given to employees with full or part-time program responsibilities, but others are not excluded. A minimum of five years service with the Corporation is required.

### Duration

A sabbatical may not exceed six months, and an employee on sabbatical may not miss more than two board meetings. Anyone on sabbatical must be prepared to return to duty if an emergency arises.

### Frequency

An individual is eligible for a sabbatical once every five years.

### Number of Employees on Sabbatical

No more than one staff member may be on sabbatical at any given time.

### Financial Arrangements

An employee receives full pay for the period of the sabbatical. Only rarely are the employee's travel expenses for the sabbatical project paid. Under still more unusual circumstances, the travel expenses of the employees' family may be paid. Payments for family members would constitute taxable income to the employee.

**Benefits**

All health and insurance benefits remain in full force and effect while a staff member is on sabbatical leave.  Vacation benefits will accrue during such leave.

**Procedure for Application**

Application should be made in writing to the president and vice president and chief administrative officer and corporate secretary.


## SMOKING POLICY

Smoking is **not** permitted by the Corporation anywhere in its offices.  The building management does **not** allow smoking in public corridors, elevators, stairwells, or the lobby area. Smoking is permitted only outside of the building.

This policy is in effect at all times.  Staff members are **not** permitted to smoke after hours in the building.

**Remember:**  The Corporation will pay for the cost of a program to help a staff member stop smoking.


## TRANSPORTATION PROBLEMS

A staff member who is out of the office due to inclement weather or minor transportation problems must use vacation or personal time.  If there is a wide-spread problem with the transportation system, staff members should check the **Emergency Number of 212-207-6398** to find out whether the office is open for business.


**Appendixes**: 1.  Payroll Schedule
2.  Overtime Authorization
3.  Claim for Incidental Local Expenses and Local Entertainment of
    Carnegie Corporation Guests
4.  Current Holiday Schedule

## PAYROLL SCHEDULE 2001-2002

| Payroll Deadline * | Payday |
|---|---|
| **2001** | |
| Thursday, October 4 | Friday, October 12 |
| Friday, October 19 | Friday, October  26 |
| | |
| Wednesday, November 7 | Wednesday, November 14 |
| Monday, November 19 | Wednesday, November 28 |
| | |
| Wednesday, December 5 | Friday, December 14** |
| **2002** | |
| Monday, January 7 | Monday, January 14 |
| Friday, January 18 | Monday, January 28 |
| | |
| Thursday, February 7 | Thursday, February 14 |
| Thursday, February 21 | Thursday, February 28 |
| | |
| Thursday, March 7 | Thursday, March 14 |
| Thursday, March 21 | Thursday, March 28 |
| | |
| Friday, April 5 | Friday, April 12 |
| Friday, April 19 | Friday, April 26 |
| | |
| Tuesday, May 7 | Tuesday, May 14 |
| Monday, May 20 | Tuesday, May 28 |
| | |
| Friday, June 7 | Friday, June 14 |
| Friday, June 21 | Friday, June 28 |
| | |
| Wednesday, July 3 | Friday, July 12 |
| Friday, July 19 | Friday, July 26 |
| | |
| Wednesday, August 7 | Wednesday, August 14 |
| Wednesday, August 21 | Wednesday, August 28 |
| | |
| Friday, September 6 | Friday, September 13 |
| Friday, September 20 | Friday, September 27 |

**\*Information must be received by the director of personnel by 10 am on the deadline dates.**

**\*\*Note that all staff members are paid only once in December, on the 14th, for the entire month.**

## CARNEGIE CORPORATION OF NEW YORK

### WEEKLY
### OVERTIME AUTHORIZATION

Date: _____

## TO THE ACCOUNTANT

You are hereby authorized to pay_____

name of employee

for extra work done **WEEK BEGINNING** _____

| | From | To | # Extra Hours | Purpose |
|---|---|---|---|---|
| Monday | | | | |
| Tuesday | | | | |
| Wednesday | | | | |
| Thursday | | | | |
| Friday | | | | |
| Saturday | | | | |
| Sunday | | | | |
| **TOTAL HOURS** | | | | |

APPROVED:
(if applicable) _____
Supervisor

APPROVED: _____
Program/Admin. Officer

APPROVED: _____
Vice President

APPROVED:_____
Director of Human Resources

Appendix 3

## CARNEGIE CORPORATION OF NEW YORK
## CLAIM FOR INCIDENTAL LOCAL EXPENSES AND
## LOCAL ENTERTAINMENT OF CARNEGIE CORPORATION GUESTS

NAME OF EMPLOYEE _____

| DATE | NATURE OF EXPENSE— IF ENTERTAINMENT, GIVE LOCATION, GUESTS, PURPOSE, ITEM (IF TRANSPORTATION, SPECIFY) | PROGRAM Code | if DCA, ACTIVITY Code | CHARGE* | CASH |
|---|---|---|---|---|---|
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |

* SPECIFY CARD OR AGENCY USED

TOTAL

CASH ( )  CHECK ( )

AMOUNT DUE EMPLOYEE

Signature: _____   Date _____

### DISTRIBUTION OF EXPENSES (SUMMARIZE BY PROGRAM AND ACTIVITY, COMBINING CHARGE AND CASH EXPENSES)

PROGRAM CODE          If DCA, ACTIVITY CODE          EXPENSES

_____          _____          _____

_____          _____          _____

_____          _____          _____

_____          _____          _____

TOTAL  _____

Receipts **must** be provided for **all** business expenses, even those less than $25.  If a receipt cannot be obtained, the staff member is responsible for maintaining a log of these expenses in order to be reimbursed.  The log must be attached to the travel report and contain the date, nature of, and business purpose of each expense.

### ORIGINAL PLUS COPY WITH RECEIPTS TO ACCOUNTS PAYABLE COORDINATOR

Appendix 4

## HOLIDAY SCHEDULE  2001–2002

### 2001

| | | |
|---|---|---|
| Monday | October 8 | Columbus Day |
| Thursday | November 22 | Thanksgiving Day* |
| Friday | November 23 | Day after Thanksgiving |
| Monday | December 24 | Christmas Eve |
| Tuesday | December 25 | Christmas Day |

### 2002

| | | |
|---|---|---|
| Tuesday | January 1 | New Year's Day * |
| Monday | January 21 | Martin Luther King Jr.'s Day |
| Monday | February 18 | Presidents' Day |
| Monday | May 27 | Memorial Day |
| Thursday | July 4 | Independence Day |
| Monday | September 2 | Labor Day |

**Two Personal Days**

* The office will close at 3:00 p.m. on the day **prior** to the holiday.

*ExHiBiT 3*

# BENEFIT PLANS

The Corporation assumes the entire cost for all benefit plans.

This chapter describes the benefits provided to the Corporation's staff members based on the current documents for the plans. In the case of any inconsistency between this handbook and the plan documents, the actual plan document will control. You may obtain a copy of any plan document by contacting the human resources office.

While it is expected that these plans will continue indefinitely, the board of trustees of the Corporation (or the planning and finance committee acting on behalf of the board of trustees) reserves the right to modify or discontinue the plans at any time. Any discontinuance or modification of the plans will not adversely affect the benefits accrued by participants prior to the date of discontinuance or modification.

Individual certificates are issued for the following insurance plans: medical, dental, long-term care, long-term disability, collective life, group life, the regular retirement plan and the tax-deferred retirement plan, if applicable.

If a staff member leaves the Corporation, health and dental benefits may be continued in accordance with the rules and regulations of the Consolidated Omnibus Budget Reconciliation Act (COBRA). Refer to the section on COBRA. A staff member who leaves the Corporation may also continue long-term care, long-term disability, and life insurance coverage by contacting the respective insurance companies directly.

## ANNUAL PHYSICAL EXAMINATION

### Eligibility

All probationary, regular and part-time salaried staff members are eligible on the first day of the month following the date on which employment began. This plan does not cover dependents.